IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>FIRST PLACE FINANCIAL CORP.<br><br>　　　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 12-12961 (BLS) |

**DECLARATION OF DAVID W. GIFFORD IN SUPPORT OF
<u>FIRST DAY MOTIONS</u>**

I, David W. Gifford, being fully sworn, declare that the following is true to the best of my knowledge, information, and belief.

1. I am the Chief Financial Officer of First Place Financial Corp. ("<u>First Place</u>," or the "<u>Debtor</u>"), the debtor and debtor-in-possession in the above-captioned bankruptcy case. In my capacity as Chief Financial Officer, I am familiar with First Place's day-to-day operations, financial condition, books, records, and business affairs.

2. On October 29, 2012, (the "<u>Petition Date</u>") First Place filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). To minimize any potential adverse effects on First Place's business as a result of commencing this bankruptcy proceeding, First Place intends to request various types of relief in certain "first day" applications and motions (collectively, the "<u>First Day Motions</u>"). The First Day Motions are aimed at minimizing disruptions to First Place's business operations, maintaining value for First Place's estate, and establishing procedures for the efficient administration of First Place's bankruptcy proceeding.

3. I submit this declaration (the "<u>Declaration</u>") in support of the First Day Motions. Except as otherwise indicated, all statements in this Declaration are based on:

(i) my personal knowledge; (ii) my review of relevant documents prepared or collected by other members of the Debtor's management, or its agents or professionals; or (iii) my opinion based upon my experience and knowledge of First Place's business operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of First Place.

## Overview of First Place

### A. First Place's Business Operations

4. First Place, a Delaware corporation, is a unitary thrift holding company based in Warren, Ohio. First Place owns 100% of the common stock of two non-debtor subsidiaries: First Place Bank (the "Bank" and collectively, with First Place, the "Company"), a federally chartered stock savings association insured by the FDIC; and First Place Holdings, Inc. ("FPH"), an Ohio corporation serving as a holding company for certain ancillary financial services businesses owned by First Place.

5. First Place conducts the bulk of its operations through the Bank, which serves customers through more than 40 branches in Ohio, Michigan, Indiana, and Maryland, and is one of the largest thrift institutions in the state of Ohio. The Bank's principal business consists of accepting retail and business deposits from the general public and investing those funds primarily in one- to four-family residential mortgage, home equity, multifamily, commercial real estate, commercial, and construction loans.

6. FPH served as a holding company for two businesses that, in the past, have provided certain ancillary financial services: First Place Real Estate, Ltd., and First

Place Insurance Agency, Ltd. ("First Place Insurance").  Substantially all of First Place Insurance's assets were sold in September, 2011.  FPH is not a debtor in this proceeding.

7. As of the Petition Date, First Place, the Bank, and FPH collectively employed hundreds of full and part-time employees across two business financial service centers, twenty loan production offices, and more than forty bank branches.

8. The Bank and First Place are highly regulated institutions. The Bank's principal regulator is the Office of the Comptroller of the Currency (the "OCC").[1]  First Place's principal regulator is the Board of Governors of the Federal Reserve System (the "FRB").[2]  Unless context otherwise requires, references herein to the "Regulators" collectively refer to, current and predecessor regulators of First Place, the Bank, and the Purchaser, as applicable.

9. The current financial and credit crisis -- resulting in hundreds of nationwide bank failures since 2008 -- significantly hampered the Bank's business and ability to meet certain regulatory requirements for capital, profitability and credit quality. Effects from the recent housing crisis, including tumbling home prices, soaring loan defaults, and high unemployment rates, have also taken their toll on First Place's financial condition.

---

[1] As a federally chartered thrift, the Bank's primary regulator prior to July 21, 2011 was the Office of Thrift Supervision (the "OTS").  The OTS was merged into the OCC, effective July 21, 2011, and upon that merger, the OCC became the Bank's primary regulator.

[2] Prior to the OTS' merger into the OCC, the OTS was also First Place's primary regulator. Following that merger, regulatory oversight for thrift holding companies, such as First Place, was transferred to the FRB.

**B.     Capital Structure**

10.     First Place's primary creditors are three capital trusts affiliated with First Place: First Place Capital Trust, First Place Capital Trust II, and First Place Capital Trust III (collectively, the "Capital Trusts"). The Capital Trusts collectively hold junior subordinated deferrable interest debentures (the "Debentures") with a face amount of approximately sixty-two million dollars ($62,000,000). The Capital Trusts acquired the Debentures with proceeds from trust preferred securities issued by the Capital Trusts that were sold to the investing public through "private placement" offerings.

11.     First Place also maintains outstanding common and preferred equity interests. First Place's common shares were previously traded on the Nasdaq market until First Place's delisting from the Nasdaq in November, 2011. Upon information and belief, First Place's common shares continue to be traded in various "over the counter" markets. As of the Petition Date, First Place had approximately 18.1 million outstanding common shares.

12.     First Place's preferred shares were issued to the United States in March, 2009 in connection with the Troubled Asset Relief Program (i.e. the TARP program). The First Place preferred shares are to pay a cumulative, 5% dividend for the first five (5) years of issuance and 9% per annum thereafter. In connection with its acquisition of the First Place preferred shares, the United States also received a warrant to purchase approximately 3.67 million First Place common shares at a strike price of $2.98/share. As of the Petition Date, there were approximately 72,900 outstanding First Place preferred shares.

**C.     Regulatory action**

13.     The Bank's excessive levels of adversely classified assets and inability to raise necessary additional capital have been major causes of increased scrutiny and action by the Regulators.  In examinations of the Bank, dated August 2, 2010 and May 26, 2011 (collectively, the "<u>OTS Exams</u>"), the OTS found that the Bank engaged in unsafe or unsound banking practices that caused the Bank to operate with: (a) an excessive level of adversely classified assets; (b) inadequate earnings to augment capital; and (c) an inadequate level of capital protection for the volume, type, and quality of assets held by the Bank.

14.     The findings in the OTS Exams prompted the OTS to require the Company to enter into Supervisory Agreements, dated March 1, 2011 (collectively, the "<u>Supervisory Agreements</u>"), which required those parties to develop strategies aimed at addressing the shortcomings identified in the initial OTS Exam.  Even after taking the actions called for in the Supervisory Agreements, the Bank's financial condition continued to deteriorate, prompting the Regulators to take additional enforcement actions.

15.     On July 13, 2011, First Place and the Bank each consented to a Cease and Desist Order issued by the OTS (collectively, the "<u>C&D Orders</u>").   The C&D Orders became effective on July 13, 2011 and replaced the Supervisory Agreements.  Under the C&D Orders, First Place and the Bank, among other things, were required to adopt plans to improve their management practices and augment the Bank's capital levels.  Notably, under the C&D Orders, the Bank was required, by December 31, 2011, to have and maintain: (i) a Tier 1 (Core) Capital Ratio equal to or greater than 8.5%; and (ii) a Total Risk-Based Capital Ratio equal to or greater than 12%.

16. If the Bank was unable to achieve these targets by December 31, 2011, the C&D Orders required the Bank to submit a contingency plan that would provide for either: (a) a merger with, or acquisition by, another federally insured depository institution or holding company; or (b) voluntary dissolution of the Bank, in conformity with applicable laws and regulations. Notwithstanding the efforts of the Company's management to address the concerns raised in the OTS Exams and take the corrective actions called for in the C&D Orders, the Company has been unable to meet the capital thresholds set forth in the C&D Orders.

17. The Bank continues to remain undercapitalized, and full satisfaction of the C&D Orders will depend on raising a significant amount of additional capital. As an undercapitalized banking institution, First Place is subject to a wide variety of enforcement remedies by regulators, including seizure of the Bank. Seizure of the Bank would produce disastrous results for First Place and its creditors.

**D.    The Company's efforts to recapitalize through equity investment, sale or merger**

18. After the Company determined that it would not be able to satisfy all of the prerequisites imposed by the C&D Orders, First Place began to explore ways to bolster the Bank's capital through a merger, sale, other transaction with a third party, as required by the C&D Orders. To that end, the Company retained an investment banking firm, Keefe, Bruyette & Woods ("<u>KBW</u>") to assist it in devising a strategy for increasing the Bank's capital levels or otherwise complying with the C&D Orders.

19. KBW's engagement became effective at the end of December, 2011. KBW has assisted First Place and the Bank in considering an array of potential alternatives for enhancing the Bank's capital levels, consistent with the requirements of

C&D Orders. Those alternatives included, without limitation, seeking a new equity investment in the Bank, and a potential sale of the Bank to a well capitalized purchaser outside of a bankruptcy proceeding. After months of reviewing alternative transaction structures, the Company determined that a potential sale of the Bank to a well capitalized purchaser with the ability to shore up the Bank's deficient capital levels would be the optimal way to both recapitalize the Bank and maximize the value of First Place's assets for the benefit of its creditors and stakeholders.

20. In June of 2012, KBW began an intensified process to market the Bank. The process began by identifying parties that might have an interest in and the capability to consummate a sale, merger or other transaction consistent with the mandates of the C&D Orders. KBW considered a broad range of potential purchasers, investors and/or merger partners, that based upon KBW's extensive experience and contacts within the industry, might have an interest in the transaction. KBW established a data room, prepared solicitation materials, and identified approximately forty-four (44) parties for targeted solicitation. KBW contacted those potential interested parties, provided materials and offered access to the data room upon execution of a confidentiality agreement. Of that group, fifteen (15) potential purchasers expressed some level of interest in a potential transaction involving the Bank. Twelve (12) of those fifteen potential purchasers conducted due diligence regarding the Bank, with four (4) of those parties engaging in on-site due diligence. Following the completion of due diligence,

only one potential bidder willing to acquire the Bank's entire franchise emerged -- Talmer Bancorp, Inc. (the "Purchaser").[3]

**E.    The Talmer proposal**

21.    Following extensive negotiations regarding the terms, structure, and purchase price for the Purchaser's proposed acquisition of the Shares and Other Purchased Assets, First Place and the Purchaser have agreed, in principle, to the key terms of the Sale, and have executed that certain Asset Purchase Agreement, dated October 26, 2012 (the "APA"), which remains subject to this Court's approval.  If effectuated, the Sale will recapitalize the Bank, ensure the Bank's regulatory compliance, maximize the value available for First Place's creditors, preserve hundreds of jobs, and save banking regulators millions of dollars, while simultaneously allowing the Bank to continue serving the needs of thousands of individuals and businesses in the Bank's market areas.  Specifically, the Purchaser is prepared to proceed with a transaction that would recapitalize the Bank with the amount needed to satisfy regulatory requirements – anticipated to be $205 million -- and concurrently allow the Purchaser to acquire the Bank from First Place for $45,000,000.

22.    In arriving at the proposed sale price with the Purchaser, First Place examined the value of the totality of its assets, both to the Purchaser, as well as theoretical, alternative purchasers that may pursue recapitalizations of the Bank through use of certain beneficial tax attributes possessed by First Place, including, without limitation, deferred tax assets and net operating losses.  The Purchaser's proposed $45,000,000 purchase price offer was negotiated in order to take account of such

---

[3] In addition to receiving an offer from the Purchaser, First Place did receive offers from two other bidders that expressed an interest in acquiring a small subset of the Bank's branches.  Neither of these purchase alternatives would have yielded the level of consideration offered by the Purchaser.

potential alternative transactions, and compensate First Place for the opportunity cost associated with forgoing such alternative transaction structures.  The $45 million offered by the Purchaser exceeds the value of all other alternatives considered.

23.     During the months preceding First Place's bankruptcy proceeding, the Company's management engaged in numerous detailed discussions with the Regulators to keep them appraised of the Company's recapitalization efforts.  Those updates included, without limitation, periodic updates regarding a proposed sale of the Shares and Other Purchased Assets through a bankruptcy "section 363" sale.

24.     The Company has disclosed the Purchaser's proposed acquisition of the Shares and Other Purchased Assets to the Regulators as a proposed mechanism for recapitalizing the Bank pursuant to the C&D Orders.  Although the Regulators are still reviewing the Purchaser's proposed acquisition of the Bank, the Company has provided the Regulators with continued updates regarding the Sale and First Place's bankruptcy proceeding.  The Company has also provided the Regulators with advanced drafts of documents associated with the Sale, such as the APA.

25.     Even after providing the Regulators with advanced notice of this bankruptcy proceeding and First Place's proposed sale of the Shares and Other Purchased Assets, the Regulators have raised no objections to this bankruptcy filing or the Sale proposed herein.  First Place believes that it can obtain all requisite approvals from the Regulators for its proposed Sale on or before the outside closing date set forth in the APA.

26.     Moreover, the Purchaser is also engaged in discussions with the Regulators in order to obtain final approval of its proposed acquisition of the Shares and

Other Purchased Assets.  The Purchaser is confident that it will successfully conclude those negotiations, and obtain all final Regulatory consents necessary to enter into the proposed Sale, prior to the Sale Hearing.

27. After successfully negotiating a proposal that will both recapitalize the Bank to the Regulators' satisfaction, and allow First Place to optimize the value of its most significant asset, First Place commenced this bankruptcy proceeding on the Petition Date, in order to consummate its proposed Bank sale and administer the remainder of its estate for the benefit of its creditors.

### First Day Motions

**A.  Emergency Motion to Approve Cash Management Procedures and Interim Waiver of Section 345(b) Requirements**

28. On the Petition Date, First Place filed its *Emergency Motion to Approve Cash Management Procedures and Interim Waiver of Section 345(b) Requirements* (the "Cash Management Motion").  Through the Cash Management Motion, First Place is seeking certain interim relief aimed at providing First Place with a workable timeframe for complying with certain cash management procedures proscribed by the United States Trustee.

29. First Place currently maintains a total of five deposit and/or money market accounts, (collectively the "Prepetition Accounts") with the following institutions (collectively, the "Banks"):  (i) First Place Bank; (ii) Key Banc Capital Markets, Inc.; (iii) Keefe, Bruyette & Woods, Inc.; (iv) Stifel Nicolaus; and (v) the Federal Hole Loan Bank of Cincinnati.  On the Petition Date, the total amount of funds held by First Place in the Prepetition Accounts totaled approximately $7.5 million.

30. The bulk of First Place's $7.5 million maintained in the Prepetition Accounts is held in an account maintained at its wholly owned subsidiary, First Place Bank. The balances within the Prepetition Accounts do not constitute "cash collateral" for purposes of section 363 of the Bankruptcy Code and all funds in such accounts are unencumbered.

31. Presently, none of First Place's Prepetition Accounts are maintained with a financial institution that has been designated as an authorized depository by the U.S. Trustee (each such financial institution, an "<u>Authorized Depository</u>").[4] In order to comply with the U.S. Trustee's cash management guidelines, the Debtor intends to transfer all funds maintained within the Prepetition Accounts from the Banks to other financial institution(s) that have been designated as an Authorized Depository by the U.S. Trustee. However, given the large cash balance presently maintained by the Debtor, it will not be administratively practicable to force the Debtor to immediately transfer all of its funds from the Banks to other Authorized Depositories at the outset of the case.

32. Given the significant size of the balances and the large number of administrative demands that will be imposed upon the Debtor's limited staff at the outset of this bankruptcy proceeding, First Place will require a brief period, not to exceed fourteen (14) days, in which it may continue to use and maintain the Prepetition Accounts, while it makes final preparations to transfer the funds within the Prepetition Accounts to an Authorized Depository. I believe that continuation of the Prepetition Accounts is essential to enable a smooth transition into chapter 11, so that the process of

---

[4] Upon information and belief, one of the Banks, Key Banc Capital Markets, Inc., may be an affiliate of a financial institution, Key Bank, which has been designated as an Authorized Depository.

opening new accounts at Authorized Depositories can be finalized with minimal interruption to First Place's estate.

33. Due to the commencement of this proceeding, some of the Banks may elect to administratively "freeze" the accounts referenced herein, unless the Court issues an order authorizing First Place to continue to use the Prepetition Accounts. Such an administrative "freeze" will complicate the First Place's efforts to transition its funds to an Authorized Depository and hinder its efforts to preserve its estate. Without access to the Prepetition Accounts, First Place will not be able to fund payments of operational expenses in the ordinary course of business. Unless First Place is able to immediately regain access to the Prepetition Accounts, it may suffer immediate and irreparable harm.

**B. Emergency Motion to Limit Certain Transfers of Equity Interests in the Debtor and Approve Related Notice Procedures**

34. On the Petition Date, First Place filed its *Emergency Motion for Order (A) Limiting Certain Transfers of Equity Interests in the Debtor and (B) Approving Related Notice Procedures* (the "NOL Motion").

35. First Place is part of a consolidated tax group that has incurred significant net operating losses in the recent past. Members of First Place's consolidated tax group include First Place and First Place's wholly-owned subsidiaries, First Place Bank (the "Bank") and First Place Holdings, Inc. ("FPH," and collectively, with First Place and the Bank, the "Tax Group"). Presently, the Tax Group's reported consolidated NOLs for the 2009 tax year amount to over $39 million. However, the actual, current balance of the Tax Group's consolidated NOLs is subject to upward revision upon the completion of a reaudit and restatement of First Place's prior consolidated financial results.

36. In December of 2010, the Audit Committee of First Place's Board of Directors determined that First Place's consolidated financial results for the fiscal year ended June 30, 2010 could no longer be relied upon, due to an understated allowance for loan losses. Subsequent investigations of First Place's consolidated financial results revealed that additional restatements of those consolidated financial results, beyond the fiscal year ending June 30, 2010 would be necessary.

37. First Place is presently in the process of restating its consolidated financial results for the fiscal years ended June 30, 2008, 2009, and 2010, as well as the interim fiscal periods ending December 31, 2007 and September 31, 2007. First Place preliminarily estimates that upon the completion of these financial restatements and submission of amended, consolidated tax returns, the cumulative balance of the Tax Group's consolidated NOLs may be subject to material upward revision.

38. These consolidated NOLs must be allocated among the members of the Tax Group. Although the bulk of these NOLs will likely be attributable to the Bank, First Place believes it will nevertheless still be entitled to a material NOL. First Place's precise share of the Tax Group's consolidated NOLs will not be determined until First Place and its accounting professionals complete their reaudit of First Place's consolidated financial results and file any amended tax returns that would be appropriate in light of the reaudited financial results.

39. First Place's share of the Tax Group's NOLs are a likely valuable asset because under the Internal Revenue Code, 26 U.S.C. § 1 et seq. (the "IRC"), First Place can carry forward NOLs to offset future taxable income for up to 20 taxable years and thereby greatly reduce future aggregate tax obligations. Assuming a 35% corporate tax

{BAY:02146196v1}
665032
-13-

rate, the NOLs could potentially produce millions of dollars in potential future tax savings.

40. At the outset of this proceeding, First Place has requested an expedited sale of its most valuable asset -- its Bank stock. After the consummation of its Bank sale, First Place will explore all available options available for maximizing the remaining value of its estate, for the benefit of its creditors and stakeholders. Although First Place is still formulating its post-Bank sale strategies, the presence of the NOLs, and accompanying tax savings associated with First Place's share of the NOLs, could significantly expand First Place's options post-Bank sale. Thus, First Place believes that it is in the best interest of its estate to preserve any potential NOLs to which First Place may be entitled following restatement of its financial results.

41. A corporation's ability to use its NOLs may be reduced or eliminated under certain circumstances. First Place's principal concern is with one of those circumstances: the possibility that First Place might experience an "ownership change." In general, under IRC § 382, if a corporation undergoes an "ownership change," the amount of NOLs that the corporation can use in any given year to reduce its taxable income is limited to an amount equal to (a) the value of the corporation's equity on the date that the "ownership change" occurred, multiplied by (b) the long-term tax-exempt rate on that date. Currently, the long-term tax-exempt rate is 2.87 percent.

42. Pursuant to IRC section 382(g), an "ownership change" occurs if, immediately after a "testing date," and as measured during a rolling 3-year "testing

period,"[5] the percentage of the corporation's stock (measured by value) held by certain significant shareholders (i.e., shareholders who own 5% or more, or who are deemed by Treasury Regulations to own 5% or more, even though they own less than 5%) increases by 50 percentage points or more.  The percentage point increase by 5% shareholders or persons or entities deemed to be 5% shareholders is referred to as an "owner shift."  Thus, an "owner shift" of more than 50 percentage points creates an "ownership change," and triggers the NOL limitation described above.

43.     Under IRC section 382(g)(4)(A), all stockholders who individually hold less than 5% of the shares of stock of a company are generally deemed to be a single 5% stockholder throughout the 3-year testing period, and transfers between such stockholders are disregarded for purposes of determining whether an "ownership change" has occurred.  Thus, so long as half or more of First Place's stock is owned by less than 5% stockholders throughout the 3-year testing period, there will be no "ownership change" under IRC section 382.

44.     Once all or part of a NOL is disallowed under IRC section 382 on account of an "ownership change," that NOLs' use is limited forever, and once an equity interest is transferred, the transfer cannot be nullified without court action.  First Place's equity interests were previously traded on the NASDAQ stock exchange, before being delisted in late 2011, and continue to be traded in the "over-the-counter" market.  Thus, unrestricted transfers of equity securities in the Debtor could hinder First Place's reorganization efforts by causing it to lose NOLs that could offset future taxable income.

---

[5]    Very generally, a "testing date" occurs when there is a change in the percentage of stock owned by a 5% shareholder before or after the change.  The broader "testing period" generally consists of the 3-year period prior to any given testing date.

45.     Consequently, First Place has submitted the NOL Motion requesting entry of an order, approving: (i) limited and tailored restrictions on trading in the Debtor's equity interests by persons who are, or may become as a result of such trades, holders of 5% or more of the First Place's outstanding equity interests (such holders, "Substantial Shareholders"); (ii) discrete noticing provisions regarding such Substantial Shareholders that will provide the Debtor the ability to take reasonable steps to protect its NOLs and other tax attributes from being unnecessarily dissipated in violation of the automatic stay. First Place is not seeking to impose such restrictions on equity security holders that are not Substantial Shareholders. As of the Petition Date, First Place was only aware of one holder of 5% or more of the Debtor's stock that would qualify as a Substantial Shareholder.[6]

C.      **Motion to Employ Donlin, Recano & Company, Inc. as Claims and Noticing Agent**

46.     First Place is a public company, and its primary creditors are the Capital Trusts, who in turn, have trust preferred security holders. Given the large number of interested parties, including common shareholders, First Place believes that the most effective and efficient manner of noticing creditors and interested parties in this case is for First Place to retain an independent third party to act as its notice, claims, and balloting agent.

47.     First Place solicited bids from three qualified and highly respected claims and noticing agents, and determined that Donlin, Recano & Company, Inc. provided the best and most cost effective proposal to act as First Place's claims and noticing agent (the

---

[6] Some of First Place's stock is held in "street name," such that the actual beneficial holder of the shares is not listed on First Place's share registry. First Place is still in the process of reviewing its list of "street name" holders, but is not presently aware of any other persons who hold more than 5% of the Debtor's stock in street name.

"<u>Claims and Noticing Agent</u>").  The Claims and Noticing Agent will assist First Place in distributing notices, as necessary, and processing other administrative information relating to First Place's bankruptcy proceeding.  Moreover, the Claims and Noticing Agent will host a website where notices and pleadings can be posted, so that interested parties, such as shareholders, can access up to date information regarding the First Place bankruptcy case.

48. Claims and Noticing Agent is a bankruptcy administration firm that specializes in claims processing, noticing, balloting, disbursement and other administrative tasks associated with chapter 11 proceedings.  First Place proposes to retain Claims and Noticing Agent on the terms and conditions set forth in an agreement (the "<u>Agent Agreement</u>"), substantially in the form attached to Claims and Noticing Agent's retention application, as such agreement may be modified by the order approving Agent's employment.  I believe that Claims and Noticing Agent is well-qualified to serve as First Place's claims agent and believe that Claims and Noticing Agent's retention is in the best interest of First Place's estate and its creditors.

## Conclusion

49. For the reasons described herein and in the First Day Motions, I believe that the prospect of maintaining First Place's business operations, minimizing the effects of its bankruptcy filing, and optimizing the value of First Place's estate for the benefit of its creditors and stakeholders will be maximized if the Court grants the relief requested in each of the First Day Motions.

50. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 29, 2012

_____
Name: David W. Gifford
Title: Chief Financial Officer

665339