(iii) the Successful Bidder is a purchaser of the Shares and the Other Purchased Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the Sale is entitled to the protections of Section 363(m);

      (iv) the Successful Bidder and the Company did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

      (v) pursuant to Section 105 of the Bankruptcy Code, any creditors of the Company are prohibited from taking any actions against the Successful Bidder or the Shares and the Other Purchased Assets; and

      (vi) the terms and provisions of the Sale are fair and reasonable.

  5.12 <u>The Bidding Procedures</u>.

    (a) The Bidding Procedures and the Bidding Procedures Order shall be in a form and substance acceptable to the Purchaser and shall include the provisions and the terms set forth in <u>Section 5.9</u>.

    (b) In order to be qualified to receive any confidential information from the Company or the Bank to submit an Initial Overbid, as that term is hereinafter defined, and to participate in the Auction, a potential bidder (an "**Overbidder**") must submit each of the following to the Company on a timely basis:

      (i) An executed confidentiality agreement which shall inure to the benefit of the Successful Bidder, in a form and substance acceptable to the Company; and

      (ii) Current audited financial statements and the latest unaudited financial statements of the Overbidder or, if the Overbidder is an entity formed for the purpose of acquiring the Shares and the Other Purchased Assets, current audited financial statements and the latest unaudited financial statements of the equity holders or sponsors of the Overbidder who will guarantee the obligations of the Overbidder, or such other form of financial disclosure and/or credit-quality support or enhancement satisfactory to the Company, if any, that will allow the Company to make a reasonable determination as to the Overbidder's financial and other capabilities to consummate the Sale (including, but not limited to, the ability to obtain all necessary regulatory approvals with respect to the ownership of the Shares and operation of the Bank on a timely basis)

    (c) Neither the Company, nor the Bank, nor any of their employees, officers, directors, affiliates, subsidiaries, representatives, agents, advisors, or professionals are responsible for, and shall bear no liability with respect to, any information obtained by potential bidders in connection with the Sale. The Company and/or the Bank shall not be obligated to furnish any due diligence information after the Bid Deadline;

    (d) In order to participate at the Auction, an Overbidder must submit the following to the Company at least ten (10) days prior to the Sale Hearing (the "**Bid Deadline**"):

      (i) a proposed asset purchase agreement (the "**Competing Purchase Agreement**"), executed by the Overbidder, that:

       1. is on substantially the same terms and conditions as those in the Purchase Agreement, along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and the Purchase Agreement;

       2. provides for a purchase price to be paid to the Company that exceeds the sum of the Cash Purchase Price and the Stalking Horse Bidder Fee by at least Two and a Half Million Dollars ($2,500,000) (such total amount, the "**Initial Minimum Overbid**," and the sum of the Stalking Horse Bidder Fee, and Two and a Half Million Dollars being referred to herein as the "**Initial Minimum Bid Increment**");

       3. provides for the recapitalization of the Bank through an equity contribution on terms not less favorable to the Bank than the Equity Contribution or on terms acceptable to Governmental Authorities as evidenced by written authorization or affidavit;

       4. remains irrevocable until one business day after the Closing;

       5. waives any right of Overbidder to receive a fee analogous to the Stalking Horse Bidder Fee or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution; and

       6. contains a proposed closing date that is not later than the Outside Date hereunder;

    (ii) a cashier's check made payable to the order of the Company in an amount equal to the Initial Minimum Overbid less the Cash Purchase Price (the "**Overbidder's Deposit**") which, if the Overbidder is the Successful Bidder, will be retained by the Company as a nonrefundable deposit for application against the purchase price at the closing of the transaction, or, if the Overbidder is not the Successful Bidder, returned to the Overbidder within three (3) business days of the Closing, in the event that the Bankruptcy Court does not approve a sale of the Shares and the Other Purchased Assets to the Overbidder. The Overbidder's Deposit provided by each Overbidder shall not earn interest;

    (iii) evidence in the form of affidavits or declarations, acceptable to the Company, establishing that the Overbidder has the financial ability to pay the cash purchase price and make the equity contribution, or to otherwise satisfy the requirements of Section 5.12(d)(i)(3), set forth in the Competing Purchase Agreement;

    (iv) a bid:

       1. containing terms and conditions that are higher and better than the terms and conditions of the Purchase Agreement;

       2. providing for a purchase price to be paid to the Company that is at least equal to the Initial Minimum Overbid; and

       3. that does not contain any due diligence, financing, or regulatory contingencies (other than, with respect to a bid by an Overbidder that the Company determines is otherwise eligible and qualified to receive such approval, those necessary regulatory approvals with respect to the ownership of the Shares and operation of the Bank) of any kind;

(v) admissible evidence in the form of affidavits or declarations, acceptable to the Company, establishing the Overbidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code;

(vi) admissible evidence in the form of affidavits or declarations, acceptable to the Company, establishing that the Overbidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement;

(vii) admissible evidence, acceptable to the Company, in the form of affidavits or declarations establishing that the Overbidder has or is capable of obtaining all required regulatory approvals to perform all of its obligations under the Competing Purchase Agreement and to close the transaction not later than the Outside Date;

(viii) a written waiver, acceptable to the Company, of any right of the Overbidder to receive a fee analogous to the Stalking Horse Bidder Fee or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution;

(ix) admissible evidence, acceptable to the Company, of authorization and approval from the Overbidder's board of directors (or comparable governing body) with respect to the execution, delivery, and closing of the submitted Competing Purchase Agreement;

(x) sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the bidder in connection with the proposed transaction. The bid shall also identify a contact person (with relevant contact information) that counterparties to any executory contract can contact to obtain additional Adequate Assurance Information; and

(xi) a statement indicating that the Overbidder consents to the core jurisdiction of the Bankruptcy Court for all disputes relating to the Sale, and has waived any right to a jury trial in connection with any disputes relating to the Auction or the Sale

(e) A "**Qualified Overbidder**" is a potential Overbidder that both:

(i) delivers to the Company a timely, conforming Competing Asset Purchase Agreement, an Overbidder's Deposit, and the other materials set forth in section "(d)" above (an "**Initial Overbid**"); and

(ii) the Company has determined is reasonably likely (based on information submitted by the Overbidder) to be able to consummate a sale if selected as the Successful Purchaser. Each Overbidder shall comply with all reasonable requests for additional information and due diligence by the Company or its advisors regarding the Overbidder and its proposed transaction. Failure by an Overbidder to comply with requests for information and due diligence access shall be a basis for the Company to determine that such Overbidder is not a Qualified Overbidder. Not later than five (5) business days after an Overbidder delivers all of the materials required in "(c)" above, the Company shall determine and notify an Overbidder if it is a Qualified Bidder. In the event that any Overbidder is not a Qualified Overbidder, the Company shall refund that Overbidder's Deposit within five (5) business days after the Bid Deadline or as soon as reasonably practicable thereafter. Any bid submitted by a Qualified Overbidder shall be a "**Qualified Bid**." Each Qualified Overbidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Sale prior to submitting any bids; and that it did not rely on any written or oral statements, representations, promises,

warranties or guaranties of the Company or its professionals, advisors, and agents and/or employees whatsoever, whether express, implied, by operation of law, or otherwise.

(f) The Purchaser shall automatically be deemed a Qualified Overbidder.

(g) If, on the Bid Deadline, the Purchaser is the only Qualified Overbidder, the Company shall not conduct an Auction and shall request at the Sale Hearing that the Bankruptcy Court approve the Purchase Agreement, including the Sale of the Shares and the Other Purchased Assets to the Purchaser and the Equity Contribution contemplated thereby, and request that the Sale Order shall be immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 62(g) of the Federal Rules of Civil Procedure;

(h) If, on the Bid Deadline, there is more than one Qualified Overbidder, the Company shall conduct an auction of the Shares and the Other Purchased Assets (the "**Auction**"), subject to approval of the Bankruptcy Court, in which the Purchaser and all other Qualified Overbidders may participate. The Auction shall be governed by the following procedures:

(i) The Company and its professionals shall direct and preside over the Auction. The auction shall be conducted at the offices of Patton Boggs LLP, 2550 M Street, NW, Washington, DC 20037 on that date determined after entry of the Bidding Procedures Order by the Bankruptcy Court, or at such other place and time as the Company shall notify all Qualified Overbidders who have submitted Qualified Bids and expressed an interest in participating in the Auction. The Company shall maintain a transcript of all bids made and announced at the Auction.

(ii) bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by the Company. The Company, at the start of the Auction, will describe the terms of the opening bid. The Purchaser shall be entitled to credit bid the amount of the Stalking Horse Bidder Fee at the Auction;

(iii) each subsequent bid, after the Initial Minimum Overbid, shall be in increments of no less than One Million Dollars ($1,000,000);

(iv) each Qualified Overbidder must certify to the Company, prior to the start of the Auction, that it has not engaged in any undisclosed group bidding or collusion with respect to the Auction or the Sale;

(v) the Purchaser shall have the right, but not the obligation, in its sole and absolute discretion, to match bids made by any Qualified Overbidder and, in such event, the Purchaser's matching bid shall be deemed the highest and best bid for the Shares and the Other Purchased Assets;

(vi) the Auction shall continue until there is only one Qualified Bid that the Company determines in its reasonable business judgment, after consultation with its advisors, is the winning bid. In making this decision, the Company, in consultation with its legal and financial advisors, may consider, among other things: (a) the number, type and nature of changes to the Purchase Agreement requested by each Qualified Overbidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Company of such modifications or delay; (c) the total consideration to be provided by the Qualified Overbidder; (d) the Qualified Overbidder's ability to close a transaction and the timing thereof; (e) the net benefit to the estate, taking into account the Purchaser's rights to the Stalking Horse Bidder Fee, and the Equity Contribution offered by the Qualified Bidder;

(vii) if, upon conclusion of the Auction, and consistent with the terms of the Bidding Procedures, the Purchaser's final bid matches or is greater than the highest bid made by any Qualified Overbidder, the Company shall request Bankruptcy Court approval of the Purchase Agreement, including the Sale of the Shares and the Other Purchased Assets to the Purchaser and the Equity Contribution contemplated thereby, and request Bankruptcy Court authorization for the Company to sell the Shares and the Other Purchased Assets to the Purchaser, and the amount of the Purchaser's final bid shall constitute the Cash Purchase Price under the Purchase Agreement; and

(viii) the Company may, with Bankruptcy Court approval, elect to deem the Purchaser's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder, if the Company reasonably concludes that the Overbidder may not be able to close on a timely basis, or for any other reason.

(i) The Purchaser has standing and is deemed to be a party in interest with standing to be heard on any motion, hearing or other matter related to this Agreement or any Overbid, or other sale of assets subject to this Agreement.

(j) These Bidding Procedures may be modified by the Company as required by the terms of the Bidding Procedures Order.

5.13 Bankruptcy Efforts. The Purchaser and the Company shall use their commercially reasonable best efforts to cause the Bankruptcy Court to (i) enter the Bidding Procedures Order and the Sale Order, and (ii) approve the Stalking-Horse Bidder Fee.

5.14 Reasonable Access to Records and Certain Personnel. In order to facilitate the Company's efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), Purchaser shall permit Company's counsel, accountants and any other professional representative of the Company, during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to any information acquired by the Purchaser pursuant to this Agreement, including financial information of the Company and the Bank that are required for the Company to complete the Post-Close Filings, or to facilitate the administration of the Bankruptcy Case. The Company shall reimburse the Purchaser for any reasonable costs necessary to comply with the provisions of this Section 5.14. The Purchaser shall retain any information acquired by the Purchaser pursuant to this Agreement for a period of six (6) years following the Closing Date. The obligations created by this Section 5.14 shall terminate thirty (30) days after the entry of a final non-appealable order by the Bankruptcy Court approving the Final Report and closing the Bankruptcy Case. Notwithstanding the forgoing, the Purchaser shall not be required to provide such information which it deems confidential or is privileged, unless required by a court order.

5.15 Public Announcements. Other than mutually agreed upon press releases and other materials to be issued upon the announcement of this Agreement or thereafter, with respect to which the parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the parties, from and after the date hereof, neither party shall make any public announcement or public comment regarding this Agreement or the Contemplated Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), unless and only to the extent that (a) the furnishing or use of information is required in making any filing or obtaining any Governmental Authorization required for the consummation of the Contemplated Transactions, or (b) the furnishing or use of such information is required by Legal Requirements.

5.16 <u>Tax Refunds</u>. The Company shall promptly transfer to the Bank any and all Tax Refunds received from any Governmental Authority.

5.17 <u>Tax Elections</u>.

(a) On its consolidated federal income Tax Return for the taxable year in which the Closing Date occurs, the Company shall elect under Treasury Regulations Section 1.1502-36(d) to reduce its tax basis in the Shares to the extent necessary to prevent any reduction of the Bank's Tax attributes. All Tax Returns filed by the Company, the Bank and its Subsidiaries shall be consistent with this provision. In addition, the Company shall take any other action reasonably requested by the Purchaser to preserve the Bank's Tax attributes.

(b) At the Purchaser's discretion, the Company will make, or forego making (and cause its Subsidiaries to make or forego making), the election under Internal Revenue Code Section 108(b)(5) for the consolidated federal return filing year that includes the date of Closing. The Purchaser will provide direction to Company on making or not making the election within twenty (20) days of receiving a preliminary calculation of how the Company would apply the provisions of Sec. 108 to any excluded cancellation of debt income.

(c) If the Bank currently has in place a valid election under Treasury Regulations Section 1.166-2(d)(3) (the "**Conformity Election**"), at the Purchaser's discretion, it will apply for voluntary revocation of the Conformity Election, effective for the Company's consolidated federal return filing year that included the date of Closing. The Purchaser will advise the Company in writing of its desire for voluntary revocation within sixty (60) days of the end of the Company's consolidated federal return filing year that included the date of Closing.

5.18 <u>Preparation and Filing of Tax Returns; Taxes</u>. The Company shall include the income, equity or other applicable tax base of the Bank and its Subsidiaries on the Company's consolidated, unitary, affiliated or other combined federal and state income Tax Returns for all periods through the end of the Closing Date (such period, the "Pre-Closing Tax Period" and such Tax Returns, the "Company Tax Returns"), in accordance with applicable tax statutes, and pay any federal and state Taxes attributable to such income, equity or other applicable tax base subject to the Bank reimbursing the Company for the Bank's pro rata share of any such income Taxes paid by the Company, such pro rata share to be determined in accordance with federal consolidated return regulations, where applicable, and with the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure. The Bank shall furnish Tax information to the Company for inclusion in such Company Tax Returns in accordance with the Bank's past custom and practice. The income of the Bank and its Subsidiaries shall be apportioned to the period up to and including the Closing Date and the period after the Closing Date by closing the books of the Bank and its Subsidiaries as of the end of the Closing Date. The Company shall timely prepare and file (or cause to be prepared and filed) the Company Tax Returns, and shall prepare all Company Tax Returns in a manner consistent with prior practice in respect of the Bank and its Subsidiaries unless otherwise required by applicable law or unless the Purchaser consents to such different treatment, such consent not to be unreasonably withheld, conditioned or delayed. The Company shall provide (or cause to be provided) to the Purchaser a copy of any Company Tax Return at least twenty (20) Business Days prior to the due date for filing such return (or, if such Tax Return is required to be filed within twenty (20) Business Days after the Closing Date, as soon as practicable after preparation but prior to filing thereof), and the Purchaser shall have ten (10) Business Days in which to review and comment on such return prior to the filing thereof. The Company shall not unreasonably withhold its consent to reflecting such Purchaser comments on such returns to the extent permitted by applicable law. The Purchaser and the Company agree to report all transactions not in the ordinary course of business occurring on the Closing Date after the Closing on the Purchaser's federal and state income Tax Returns

to the extent permitted by Treasury Regulations Section 1.1 502-76(b)(1)(ii)(B). Neither Party shall amend or cause to be amended any consolidated/unitary Tax Returns that relates to any Tax period or portion thereof that ends on or before the Closing Date without the consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed.

       5.19    Tax Cooperation. In connection with the preparation of Tax Returns, audit examinations, and any administrative or judicial proceedings relating to the Tax liabilities imposed on or attributable to the Bank or its Subsidiaries, the Purchaser on the one hand and the Company on the other hand shall reasonably cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful for the preparation of such Tax Returns, the conduct of audit examinations or the defense of claims by taxing authorities as to the imposition of Taxes. The Company shall provide to the Purchaser copies of all information, returns, books, records and documents relating to any Tax matters of or attributable to the Bank or its Subsidiaries.

       5.20    Tax Proceedings. The Company shall promptly notify the Purchaser upon receipt by the Company of any notice of any inquiries, assessments, audits, proceedings or similar events received from any taxing authority with respect to any Taxes, Tax attributes (including net operating losses) or Tax Refunds of or attributable to the Bank and its Subsidiaries, including such items included in any consolidated, affiliated, unitary or other combined Tax Return, whether attributable to the Pre-Closing Tax Period or any period or portion of a period after the Closing Date (any such inquiry, assessment, audit, proceeding or similar event, a "**Tax Matter**"). The Purchaser shall have the right to control the process, disposition and decision of whether to settle any Tax Matter in its sole discretion. In addition, the Company shall not enter into any settlement of or otherwise compromise any inquiry, assessment, audit, proceeding or similar event to the extent that such settlement or compromise could adversely affect the Tax liability (including a reduction of a Tax Refund, net operating loss or other Tax attribute) of the Bank, its Subsidiaries or the Purchaser, including under this Agreement, without the consent of the Purchaser, such consent not to be unreasonably withheld, conditioned or delayed.

       5.21    Transfer Taxes. Notwithstanding any other provision of this Agreement, the Purchaser shall be solely responsible for any transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other similar non-income Taxes and administrative fees (including, without limitation, notary fees) ("**Transfer Taxes**") arising in connection with the consummation of the Contemplated Transactions, whether levied on the Company, the Purchaser or its Affiliates. The Purchaser shall timely prepare (or cause to be prepared) any Tax Returns with respect to Transfer Taxes arising in connection with the consummation of the Contemplated Transactions (the "**Transfer Tax Returns**"). The Purchaser shall provide (or cause to be provided) to the Company a copy of any Transfer Tax Return at least ten (10) days prior to the due date for filing such return, and the Company shall have five (5) days in which to review and comment on such return prior to the filing thereof. The Purchaser shall take any such Company comments into consideration in good faith, provided, however, that the Purchaser shall have final determination as to the contents of any Transfer Tax Return unless the Company believes and informs the Purchaser that, upon advice of its advisors, a position taken by the Purchaser is not permitted under applicable law, and provided, further, that if the Company so believes any position reflected on a Transfer Tax Return is not permitted under applicable law, the parties shall engage an independent third party accounting firm to determine whether such position is permitted under applicable law and the determination of such accounting firm shall control the treatment of the disputed position(s) on such Transfer Tax Return. The expense of such accounting firm shall be borne 50% by the Company and 50% by the Purchaser. The Company shall timely file all Transfer Tax Returns and the Purchaser shall pay to the Company the amount shown as due on any such return at least three (3) days prior to the due date of such return. Upon the request of the Company, the Purchaser agrees to pay to the Company any additional Transfer Taxes, along with related penalties and interest, if any, if and to the

extent the Company is then liable for such Transfer Taxes pursuant to an audit or other proceeding by a taxing authority in respect of any Transfer Taxes that the Purchaser has not previously paid over to the Company or a taxing authority. The Company and the Purchaser shall cooperate to minimize Transfer Taxes. If a certificate or document of exemption is required to reduce or eliminate the Transfer Taxes, the Purchaser will promptly furnish such certificate or document to the Company or the Purchaser will cooperate with the Company to allow the Company to obtain such reduction or exemption from Transfer Taxes.

        5.22    Resignations. The Company shall deliver to the Purchaser written resignations, in form and substance reasonably acceptable to the Purchaser, effective as of the Closing Date, of each member of the board directors of the Bank other than those listed on Schedule 5.22 (the "**Continuing Board Members**").

        5.23    Deferred Compensation Plan. Subject to receipt of non-objection from the OCC, effective as of the day immediately preceding the Closing Date, the Company shall (or shall cause the Bank to) terminate the Deferred Compensation Plan in a manner consistent with Section 409A of the Code and the regulations thereunder. As soon as permissible under Code Section 409A-related regulations and any Regulatory Agreements, the Purchaser, or the Bank at the Purchaser's discretion, shall make a lump sum payment to each director of the Bank eligible under the Deferred Compensation Plan equal to the amount payable to such director under the Deferred Compensation Plan.

        5.24    Bankruptcy Filings.

            (a)    From and after the Agreement Date through the Closing Date, promptly before filing any papers or pleadings in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Bid Procedures, the Contemplated Transaction or the Purchaser, the Company shall provide the Purchaser with a copy of such papers or pleadings.

            (b)    The Company shall, through the Closing Date, use its best efforts to provide the Purchaser with prompt notice of any papers or pleadings filed by a party other than the Purchaser in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Bid Procedures or the Purchaser.

        5.25    Transfer of Business-Related Assets and Contracts. If at any time, whether before or after the Closing, the Company or any of its officers or employees discovers or is otherwise aware of the fact that the Company or one of its Subsidiaries (other than the Bank or its Subsidiaries) (a) owns any asset (whether real, personal, tangible, intangible or otherwise) that is used or held for use in connection with, or that relates to, the Business or (b) is a party to any Contract relating to the Business, the Company will promptly give notice of that fact to the Purchaser and, if the Purchaser so requests, the Company will promptly cause such asset to be transferred to the Bank free and clear of all Encumbrances, or the rights and obligations (but not any obligations relating to a pre-transfer breach or default) under such Contract to be assigned to the Bank free and clear of all Encumbrances, as the case may be, for no consideration.

        5.26    Plan. The Company covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by the Company for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of the Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is approved pursuant to the Sale Order.

5.27    Appeal.  If the Sale Order or the Bidding Procedures Order is appealed by any Person, or petition for certiorari or motion for rehearing, reconsideration or rehearing is filed with respect thereto, the Company agrees to take all action as may be reasonably necessary to defend against such appeal, petition or motion and to obtain an expedited resolution of such appeal, petition or motion.

5.28    Non-Solicitation of Competing Bids.  Except in accordance with the Bidding Procedures Order (once entered by the Bankruptcy Court), the Company shall not, and shall cause its Affiliates and its and their representatives not to, (a) solicit or negotiate with any Specified Person (and to cease immediately any such ongoing activity), or enter into any agreement or understanding with respect to, or approve or recommend, any direct or indirect sale of any equity interest in, or any material portion of the assets of, the Company or the Bank or any extraordinary corporate transaction directly or indirectly involving the Company or the Bank or (b) provide any Specified Person (other than the Purchaser and its Affiliates, agents and representatives) with access to the books, records, operating data, contracts, documents or other information relating to the Bank.  The Company shall promptly notify the Purchaser of any proposal or offer from a third party to acquire, directly or indirectly, all or any substantial portion of the assets, properties, rights and interests of the Company or the Bank received by the Company in writing after the date hereof until the Bankruptcy Court shall have entered the Bidding Procedures Order, and the Company shall communicate to the Purchaser the material terms of any such bid.

5.29    Employees.  As soon as administratively practicable after the Closing Date and until the second anniversary of the Closing Date, and subject to Purchaser's and its Subsidiaries' respective authority to amend, from time to time, or terminate the Purchaser Plans (defined below) and all other plans, programs and other arrangements, Purchaser shall use commercially reasonable efforts to enable employees of the Bank who become employees of the Purchaser or a Subsidiary of Purchaser to be entitled to participate in each employee welfare benefit plan (as defined in ERISA Section 3(1)) and Qualified Plan of broad and general applicability of Purchaser and its Subsidiaries (collectively, the "Purchaser Plans" and each, a "Purchaser Plan") to the same extent as similarly-situated employees of Purchaser and its Subsidiaries, provided, however, that such enabling of such employees of the Bank may occur at different times with respect to different plans and provided, further, that Purchaser shall use commercially reasonable efforts to continue coverage under the applicable plans of the Bank until such employees are permitted to participate in the applicable Purchaser Plans.  Purchaser shall take all reasonable action so that employees of the Bank who become employees of Purchaser or its Subsidiaries shall be entitled to receive credit for their consecutive years of employment by the Bank up to the Closing Date for purposes of any eligibility or vesting requirements under the relevant benefit plans of Purchaser or its Subsidiaries in which they are eligible to participate. Purchaser expressly acknowledges its obligation to honor the terms of the Bank's employee severance compensation plan. In addition, any employee of the Bank who is terminated within one year of the Closing Date by Purchaser but is not otherwise eligible to receive severance payments under such plan will be entitled to severance payments equal to two weeks of pay for each full year of service, subject to a minimum of four weeks and a maximum of ten weeks.  Notwithstanding anything in this Agreement to the contrary, no provision or term of this Agreement shall constitute or be deemed to constitute an amendment of, or a term or provision of, any Purchaser Plan or any other plan, program or other arrangement.

5.30    Certain Benefit Arrangements».  Upon not less than ten (10) days' notice prior to the Closing Date from Purchaser to the Company, the Company shall cause the termination, amendment or other appropriate modification of each Qualified Plan such that the Bank shall not sponsor or otherwise have any further Liability or other obligation in connection with such Qualified Plans, effective as of the date which immediately precedes the Closing Date.  Upon such action, participants in the First Place Bank 401(k) Plan and the First Place Bank Employee Stock Ownership Plan shall be 100% vested in their account balances.  In addition, Purchaser, in its sole and absolute discretion, may refinance the loans

granted under the First Place Bank 401(k) Plan to Bank employees who become employees of the Purchaser or a Subsidiary so that such loans are repaid to the First Place 401(k) on or before the Closing.

## ARTICLE 6

## CONDITIONS OF CLOSING

6.1     Conditions to the Purchaser's Obligations. The obligation of the Purchaser to complete the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions:

(a)     Representations and Warranties. (i) The representations and warranties of the Company contained in Sections 3.1, 3.2, 3.3, 3.11, 3.17 and 3.24 shall be true and correct in all respects as of the date of this Agreement and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date) and (ii) the representations and warranties of the Company contained in this Agreement (other than those representations and warranties specified in sub-clause (i) above) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifications contained therein) as of the date of this Agreement and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date), except where the failure of such representations and warranties in this sub-clause (ii) to be so true and correct (without regard to materiality or Material Adverse Effect qualifications contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     Covenants. The covenants and obligations of the Company to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c)     Petition Date. The Company shall have filed the Bankruptcy Case within one (1) Business Day following the date hereof;

(d)     Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance acceptable to the Purchaser, including the Stalking-Horse Bidder Fee, and such order shall be unstayed, and shall not have been amended, modified, reversed or vacated;

(e)     Sale Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been (i) stayed, vacated, or reversed, or be the subject of any pending motion seeking such relief, (ii) (except with the express written consent of the Purchaser not to be unreasonably withheld or delayed) amended, supplemented or otherwise modified or (iii) subject to an appeal, which, in the Purchaser's reasonable judgment, would not be mooted as a result of the Closing;

(f)     Secretary's Certificate. The Company shall have delivered to the Purchaser a Secretary's Certificate certifying to the effect that the conditions set forth in Section 6.1(a) and (b) have been satisfied.

(g)     Purchaser Required Approvals. The Purchaser shall have obtained all of the Purchaser Required Approvals in form and substance acceptable to Purchaser and without the imposition of any Burdensome Condition, no such Purchaser Required Approval shall have been amended, modified,

reversed or vacated and all applicable waiting periods with respect to any of the Purchaser Required Approvals shall have expired;

        (h)    Consents. The material consents necessary for the continued operations of the Business, which are set forth in Section 6.1(h) of the Disclosure Schedule, shall have been obtained in form and substance acceptable to the Purchaser and shall be in effect;

        (i)    Bank Expenses. The Bank shall not have incurred, and the Company's chief financial officer shall have delivered to the Purchaser within five (5) Business Days of the Closing, an officer's certificate certifying that the Bank shall not have incurred, in excess of $8.5 million in total legal, investment banking, and insurance-related costs (including contributions to a self insurance fund) and expenses in connection with, or in preparation for, the transactions contemplated by this Agreement (inclusive of costs and expenses of the Bank triggered by the consummation of the transactions contemplated by this Agreement);

        (j)    No Litigation. There shall not be pending or threatened any Proceeding by any Governmental Authority or other Persons which, in the reasonable opinion of the Purchaser, there is a possibility of an outcome that could have a Material Adverse Effect;

        (k)    No Material Adverse Effect. From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect; and

        (l)    Deferred Compensation Plan. Evidence, in form and substance satisfactory to the Purchaser, that in accordance with Section 5.23, the Deferred Compensation Plan has been terminated.

The foregoing conditions are for the benefit of the Purchaser only, and accordingly, the Purchaser will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination in the event of non-performance of any other conditions in whole or in part.

    6.2    Conditions to the Company's Obligations. The obligation of the Company to complete the transactions contemplated by this Agreement is subject to the fulfillment of each of the following conditions:

        (a)    Representations and Warranties. The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular date shall have been true and correct only on such date);

        (b)    Covenants. The covenants and obligations of the Purchaser to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

        (c)    Sale Order. The Bankruptcy Court shall have entered the Sale Order; and

        (d)    Secretary's Certificate. The Purchaser shall have delivered to Seller a Secretary's Certificate certifying to the effect that the conditions set forth in Section 6.2(a) and (b) have been satisfied.

The foregoing conditions are for the benefit of the Company only and accordingly the Company will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination in the event of non-performance of any other conditions in whole or in part.

      6.3     <u>Mutual Condition</u>. The obligations of the Company and the Purchaser to complete the Contemplated Transactions are subject to the fulfillment of the condition that no injunction or restraining order or other decision, ruling or order of a court, board, Governmental Authority or administrative tribunal of competent jurisdiction being in effect which prohibits, restrains, limits or imposes conditions on the transactions contemplated by this Agreement and no action or proceeding having been instituted or remaining pending or having been threatened (and such threat not having been withdrawn) before any such court, board, Governmental Authority or administrative tribunal to restrain, prohibit, limit or impose conditions on the transactions contemplated by this Agreement.

      6.4     <u>Termination</u>.

      (a)     In the event that the Closing has not occurred on or before January 31, 2013 or such later date as may be agreed in writing by the Parties in their sole discretion (the "**Outside Date**"), the Purchaser or the Company, as applicable, may, subject to <u>Section 9.10</u>, terminate this Agreement, in which event the parties will be released from all obligations under this Agreement, except that the Company will not be released from its obligations to pay the Stalking Horse Bidder Fee on the first Business Day following the date of consummation of an Alternative Transaction unless the Purchaser is in material breach of this Agreement, and provided that no party will be released from its obligations, or may terminate this Agreement if it has materially breached (and not cured) any of its covenants or obligations in or under this Agreement and such breach has been the cause of or resulted in the failure of the Closing to occur on or before the Outside Date.

      (b)     This Agreement may also be terminated prior to the Closing:

      (i)     at any time by the mutual written agreement of the Company and the Purchaser;

      (ii)     by the Purchaser (provided, that the Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in <u>Section 6.1(a)</u> or <u>(b)</u> have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within thirty (30) days after written notice by the Purchaser to the Company;

      (iii)     by the Company (provided, that the Company is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in <u>Section 6.2(a)</u> or <u>(b)</u> have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within thirty (30) days after written notice by the Company to the Purchaser;

      (iv)     by the Company or the Purchaser, if the Bankruptcy Court enters a Sale Order approving the Sale to a Qualified Overbidder, other than the Purchaser;

      (v)     by either the Company or the Purchaser, with fifteen (15) days' prior written notice or such shorter period as required by a court or Governmental Authority, or any applicable Legal Requirement, if any court or Governmental Authority shall finally determine that the subject of this

Agreement violates any applicable Legal Requirement and the terms of this Agreement cannot be amended to meet all legal requirements to the satisfaction of such court or Governmental Authority;

(vi) by either the Company or the Purchaser, if the Purchaser or any of its Affiliates receives written notice from or is otherwise advised by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any of the Purchaser Required Approval or receives written notice from such Governmental Authority that it will not grant such Purchaser Required Approval on the terms contemplated by this Agreement without imposing any Burdensome Condition;

(vii) upon two (2) days' prior written notice by the Purchaser to the Company, if the Bankruptcy Court fails to approve the Stalking-Horse Bidder Fee as part of the Bidding Procedures Order; provided that such notice of termination is provided to the Company not later than the end of the second Business Day following such date;

(viii) by Purchaser, if the Bankruptcy Court has not entered the Bidding Procedures Order within twenty-five (25) days of the Petition Date or if the Bidding Procedures Order has been entered but is stayed as of such date; and

(ix) by Purchaser, if the Bankruptcy Court has not entered the Sale Order approving the Sale to Purchaser by thirty-five (35) days after entry of the Bidding Procedures Order, if such Sale Order has been entered but is stayed or has been reversed or vacated on such date, or if such Sale Order has been entered but has been amended or modified without the prior written consent of Purchaser on or before such date.

## ARTICLE 7

### CLOSING TRANSACTIONS

7.1 <u>Time and Place</u>. The Closing shall take place in the offices of Nelson Mullins Riley & Scarborough LLP at 101 Constitution Avenue, NW, Suite 900, Washington, DC 20001 on the Closing Date; or at such other time and date, or both, as the Company and the Purchaser or their respective counsel may agree upon in writing.

7.2 <u>Company's Closing Deliverables</u>. At the Closing, the Company shall deliver the following to the Purchaser:

(a) a certificate signed by Secretary of the Company, certifying to the fulfillment of the conditions specified in <u>Section 6.1(a)</u> and <u>(b)</u>;

(b) stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank and with all required stock transfer Tax stamps affixed;

(c) all conveyances, transfers, assignments, instruments and other documents which are necessary to assign, sell and transfer the Shares to the Purchaser and the Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts, if any) to the Bank, in either case as contemplated by this Agreement in such form and content as the Purchaser may require, acting reasonably;

(d) certified copies of a resolution of the directors of the Company approving the completion of the Contemplated Transactions including, without limitation, the sale of the Shares and the

Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts) and the execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement in such form and content as the Purchaser may require, acting reasonably;

(e) a certified copy of the Sale Order;

(f) a letter agreement, in form and substance reasonably satisfactory to the Purchaser, releasing the Purchaser, the Bank and their respective Affiliates (and their respective officers, directors, employees, managers, partners, members, and principals) from and against any pre-Closing Liabilities to the Company or its Subsidiaries (other than the Bank and its Subsidiaries) other than Liabilities under this Agreement and the Other Purchased Assets first arising after the Closing (the "**Assumed Contract Liabilities**").

(g) an affidavit from the Company that it is not a "foreign person" or subject to withholding requirements under the Foreign Investment in Real Property Tax Act of 1980, as amended;

(h) except for those directors set forth on Schedule 5.22, written resignation letters of all of the members of the board of directors of the Bank, which resignations shall be effective as of the Closing; and

(i) evidence, in form and substance reasonably satisfactory to the Purchaser, of the termination of the Deferred Compensation Plan; and

7.3 Purchaser's Closing Deliverables. At the Closing, the Purchaser shall effect the Equity Contribution and deliver the following to the Company:

(a) a certificate signed by Secretary of the Purchaser, certifying to the fulfillment of the conditions specified in Section 6.2(a) and (b);

(b) the Cash Purchase Price; and

(c) a letter agreement, in form and substance reasonably satisfactory to the Company, releasing the Company and its respective Affiliates (and its respective officers, directors, employees, and managers) from and against any pre-Closing Liabilities to the Bank or its Subsidiaries other than the Assumed Contract Liabilities and Liabilities under this Agreement.

7.4 Concurrent Delivery. It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

7.5 Transfer of Shares. Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Sale of the Shares to the Purchaser and the sale of the Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts, if any) to the Bank shall be deemed to take effect on the Closing Date.

# ARTICLE 8

## SURVIVAL OF REPRESENTATIONS AND COVENANTS

8.1    Survival. The Company and the Purchaser agree that all of the representations, warranties, agreements and covenants of the Company and the Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the representations, warranties, agreements and covenants that by their terms survive the Closing Date and this Article 8 and Article 9 shall survive the Closing Date.

# ARTICLE 9

## MISCELLANEOUS

9.1    Legal and Other Fees and Expenses. Unless otherwise specifically provided herein, the parties will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement, the completion of the Contemplated Transactions and other matters pertaining hereto.

9.2    Notices. Any notice, request, demand or other communication required or permitted to be given under this Agreement shall be in writing and delivered by hand, facsimile transmission or prepaid registered mail (return receipt requested) to the party to which it is to be given as follows:

    To the Company:
        First Place Financial Corp.
        185 East Market Street
        Warren, Ohio 44481
        Attention: Craig Carr
        Facsimile: (330) 373-9906

    with a copy to:
        Patton Boggs LLP
        2550 M Street, NW
        Washington, DC 20037
        Attention: Joseph G. Passaic, Jr.
        Facsimile: (202) 457-6315

    To Purchaser:
        Talmer Bancorp, Inc.
        2301 W. Big Beaver Road, 5th Floor
        Troy, Michigan 48084
        Attention: David T. Provost
        Facsimile No.: (248) 498-2914

    with a copy to:
        Nelson Mullins Riley & Scarborough LLP
        Atlantic Station
        201 17th Street NW, Suite 1700
        Atlanta, Georgia 30363
        Attention: J. Brennan Ryan
        Facsimile No.: (404) 322-6041

or to such other address or fax number as a party may specify by notice given in accordance with this Section 9.2. Any such notice, request, demand or other communication given as aforesaid will be deemed to have been given, in the case of delivery by hand or registered mail, when delivered, in the case of delivery by facsimile transmission, when a legible facsimile is received by the recipient if received before 5:00 p.m. local time on a Business Day, or on the next Business Day if such facsimile is received on a day which is not a Business Day or after 5:00 p.m. local time on a Business Day.

        9.3    Further Assurances. Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement, give effect to the transactions contemplated by this Agreement and assure to the Purchaser good and valid title to the Shares, free and clear of all Encumbrances, and assure to the Bank good and valid title to the Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts, if any), free and clear of all Encumbrances. The Company shall seek to enforce its rights under any third party nondisclosure or confidentiality agreements on behalf of and at the request and expense of the Purchaser.

        9.4    Time of the Essence. Time shall be of the essence of this Agreement.

        9.5    Entire Agreement. This Agreement (and all related documents referred to herein, including the schedules and exhibits hereto) constitutes the entire agreement between the Company and the Purchaser pertaining to the Contemplated Transactions and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Company and the Purchaser and there are no warranties, representations, covenants, obligations or agreements between the Company (or any Affiliate thereof) and the Purchaser (or any Affiliate thereof) except as set forth in this Agreement (or any such related document).

        9.6    Assignment. Neither party to this Agreement may assign any of its respective benefits, obligations or liabilities under or in respect of this Agreement without the prior written consent of the other party, which may be withheld in its absolute discretion; provided, however, that the Purchaser may, without the consent of the Company, assign its rights and benefits under or in respect of this Agreement, in whole or in part, to one or more directly or indirectly wholly-owned Subsidiaries, if and to the extent permitted by the Regulatory Approvals and the Bankruptcy Court, but no such assignment will relieve the Purchaser of its obligations under this Agreement. Any attempted assignment without the necessary consent shall be void.

        9.7    Invalidity. Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

        9.8    Waiver and Amendment. Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver. No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement nor a continuing waiver unless otherwise expressly provided.

        9.9    Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder;

provided, however, that the current directors and officers of the Bank included in the term "Indemnified Parties" shall be deemed to be third-party beneficiaries of the provisions of Section 5.5.

        9.10     Surviving Provisions on Termination. Notwithstanding any other provisions of this Agreement, if this Agreement is terminated, the provisions of Sections 1.3, 5.2, 5.3, 5.9, 5.14, 6.4(a) and 9.1 shall survive such termination and remain in full force and effect, and each party shall remain liable for any willful breach of this Agreement prior to its termination.

        9.11     Captions. The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

        9.12     Counterparts. This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

        [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

COMPANY

FIRST PLACE FINANCIAL CORP.

By: *Samuel A. Roth*
Name: Samuel A. Roth
Title: Chairman of the Board


PURCHASER

TALMER BANCORP, INC.

By: _____
Name: David T. Provost
Title: Chief Executive Officer

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

**COMPANY**

**FIRST PLACE FINANCIAL CORP.**

By: _____
      Name: Samuel A. Roth
      Title: Chairman of the Board


**PURCHASER**

**TALMER BANCORP, INC.**

By: _____
      Name: David T. Provost
      Title: Chief Executive Officer

## **SCHEDULES AND EXHIBITS**

To be filed under seal and/or review shall be subject to execution of a non-disclosure agreement acceptable to First Place.