# EXHIBIT A

EXECUTION VERSION

---

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

by and between

FIRST PLACE FINANCIAL CORP.,
a Delaware corporation,

and

TALMER BANCORP, INC.,
a Michigan corporation

Dated as of December 14, 2012

---

# TABLE OF CONTENTS

Page

ARTICLE 1    INTERPRETATION ..................................................................................... 1
   1.1    Definitions ........................................................................................................ 1
   1.2    Currency........................................................................................................... 11
   1.3    Governing Law. .............................................................................................. 11
   1.4    Schedules and Exhibits ................................................................................... 11

ARTICLE 2    PURCHASE OF SHARES AND OTHER ASSETS; EQUITY CONTRIBUTION ........ 12
   2.1    Purchase and Sale of the Shares and other Assets ....................................... 12
   2.2    Consideration................................................................................................... 12
   2.3    Assumption and Satisfaction of Assumed Securities.................................... 12
   2.4    Payments .......................................................................................................... 13

ARTICLE 3    REPRESENTATIONS AND WARRANTIES OF THE COMPANY ........................... 13
   3.1    Corporate Status and Authority; Non-Contravention. ................................. 13
   3.2    Capitalization of the Bank. ............................................................................ 14
   3.3    Business Operations......................................................................................... 15
   3.4    Regulatory Reports. ........................................................................................ 17
   3.5    Deposits ........................................................................................................... 17
   3.6    Financial Matters. ........................................................................................... 18
   3.7    Tax Matters. .................................................................................................... 19
   3.8    Litigation and Claims...................................................................................... 21
   3.9    Employee Matters. .......................................................................................... 21
   3.10   Properties and Leases...................................................................................... 23
   3.11   Absence of Certain Changes........................................................................... 24
   3.12   Commitments and Contracts........................................................................... 24
   3.13   Risk Management Instruments ....................................................................... 25
   3.14   Environmental Matters ................................................................................... 26
   3.15   Insurance .......................................................................................................... 27
   3.16   Intellectual Property........................................................................................ 27
   3.17   Related Party Transactions.............................................................................. 28
   3.18   Community Reinvestment Act......................................................................... 28
   3.19   Anti-money Laundering................................................................................... 28
   3.20   Customer Information Security........................................................................ 28
   3.21   Loan Portfolio. ................................................................................................ 29
   3.22   Qualification as Mortgage Lender, Originator and Servicer........................ 30
   3.23   Servicing. ......................................................................................................... 31
   3.24   Brokers or Finders .......................................................................................... 31
   3.25   Disclaimer of Other Representations and Warranties................................... 31

ARTICLE 4    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ........................ 32
   4.1    Corporate Status and Authority; Non-contravention. .................................. 32
   4.2    Governmental Authorizations......................................................................... 32
   4.3    Investment Intent ............................................................................................ 32
   4.4    Sufficient Funds. ............................................................................................. 33
   4.5    Non-reliance..................................................................................................... 33
   4.6    Litigation and Claims...................................................................................... 33

i

ARTICLE 5      PRE-CLOSING MATTERS AND OTHER COVENANTS............................................33
    5.1       Operations until Closing. ...................................................................................33
    5.2       Confidentiality. ...................................................................................................37
    5.3       Return of Information. .......................................................................................38
    5.4       Consents and Approvals. ...................................................................................38
    5.5       Indemnification; D&O Insurance. ....................................................................40
    5.6       Certain Company Contracts. .............................................................................40
    5.7       Notice of Certain Events. ..................................................................................40
    5.8       Payment of the Broker's Fees. ..........................................................................41
    5.9       Stalking-Horse Bidder Fee. ...............................................................................41
    5.10      Debtor in Possession. .......................................................................................42
    5.11      The Sale Motion. ................................................................................................42
    5.12      The Bidding Procedures......................................................................................43
    5.13      Bankruptcy Efforts. ...........................................................................................47
    5.14      Reasonable Access to Records and Certain Personnel. .....................................47
    5.15      Public Announcements. ......................................................................................48
    5.16      Tax Refunds. ......................................................................................................48
    5.17      Tax Elections. .....................................................................................................48
    5.18      Preparation and Filing of Tax Returns; Taxes. .................................................48
    5.19      Tax Cooperation. ...............................................................................................49
    5.20      Tax Proceedings..................................................................................................49
    5.21      Transfer Taxes. ..................................................................................................49
    5.22      Resignations. ......................................................................................................50
    5.23      Deferred Compensation Plan. ............................................................................50
    5.24      Bankruptcy Filings..............................................................................................50
    5.25      Transfer of Business-Related Assets and Contracts. .........................................50
    5.26      Plan. ....................................................................................................................51
    5.27      Appeal..................................................................................................................51
    5.28      Employees. ..........................................................................................................51
    5.29      Certain Benefit Arrangements». ........................................................................51

ARTICLE 6      CONDITIONS OF CLOSING.............................................................................52
    6.1       Conditions to the Purchaser's Obligations.........................................................52
    6.2       Conditions to the Company's Obligations. .......................................................53
    6.3       Mutual Condition.................................................................................................54
    6.4       Termination..........................................................................................................54

ARTICLE 7      CLOSING TRANSACTIONS..............................................................................55
    7.1       Time and Place....................................................................................................55
    7.2       Company's Closing Deliverables. .....................................................................55
    7.3       Purchaser's Closing Deliverables. ....................................................................56
    7.4       Concurrent Delivery. .........................................................................................56
    7.5       Transfer of Shares. ............................................................................................57

ARTICLE 8      SURVIVAL OF REPRESENTATIONS AND COVENANTS .......................57
    8.1       Survival...............................................................................................................57

ARTICLE 9      MISCELLANEOUS ...............................................................................................57
    9.1       Legal and Other Fees and Expenses. .................................................................57
    9.2       Notices. ...............................................................................................................57
    9.3       Further Assurances.............................................................................................58
    9.4       Time of the Essence............................................................................................58
    9.5       Entire Agreement................................................................................................58

9.6     Assignment. ...................................................................................................... 58
9.7     Invalidity. ........................................................................................................... 59
9.8     Waiver and Amendment. ................................................................................... 59
9.9     Third-Party Beneficiaries. ................................................................................ 59
9.10    Surviving Provisions on Termination. .............................................................. 59
9.11    Captions. ............................................................................................................ 59
9.12    Counterparts. ..................................................................................................... 59

### SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule I to the Original Agreement | Disclosure Schedule |
| Schedule 2.1 | Acquired Company Assets |
| Schedule 4.2 to the Original Agreement | Purchaser Required Approvals |
| Schedule 5.5(a) to the Original Agreement | Indemnification Agreement |
| Schedule 5.6 to the Original Agreement | Assumed Bank Related Contracts |
| Schedule 5.8 to the Original Agreement | Broker's Fees |
| Schedule 5.22 to the Original Agreement | Continuing Board Members |
| Schedule 6.1(h) to the Original Agreement | Consents |
| Exhibit A | Bidding Procedures Order |

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

**THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of December 14, 2012, by and between First Place Financial Corp., a Delaware corporation (the "**Company**"), and Talmer Bancorp, Inc., a Michigan corporation (the "**Purchaser**").

### RECITALS

A.    The Company owns all of the issued and outstanding shares of Common Stock of First Place Bank, a federal savings association (the "**Bank**").

B.    The Company wishes to sell, and the Purchaser wishes to purchase, all of the shares of Common Stock of the Bank issued and outstanding as of the Closing Date (as hereinafter defined) (the "**Shares**"), free and clear of all Encumbrances (as hereinafter defined), and certain other assets of the Company, all on the terms and conditions set forth in this Agreement.

C.    The Company filed a voluntary bankruptcy petition (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") promptly following the Original Agreement Date (as defined below) (the date of such filing, the "**Petition Date**").

D.    The parties intend for the sale and purchase of the Shares and the Other Purchased Assets (the "**Sale**"), including the assumption and assignment of the Assumed Bank Related Contracts (if any), to be effectuated pursuant to an order of the Bankruptcy Court under Sections 105, 363 and 365 of the Bankruptcy Code approving such transactions with Purchaser or a bidder that makes a higher or otherwise better bid.

E.    The parties entered into an Asset Purchase Agreement (the "**Original Agreement**") on October 26, 2012 (the "**Original Agreement Date**").

F.    The parties wish to amend and restate the Original Agreement as set forth herein.

In consideration of the covenants, agreements, representations and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, covenant and agree as follows:

### ARTICLE 1

### INTERPRETATION

1.1    <u>Definitions</u>.  In this Agreement, unless the context otherwise requires or unless otherwise specifically provided herein:

(a)    "Adequate Assurance Information" is defined in <u>Section 5.12(c)(ix)</u>.

(b)    "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and

policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

(c)    "Agreement" is defined in the introductory paragraph.

(d)    "Alternative Bids" is defined in Section 5.12(k).

(e)    "Alternative Transaction" means any one of the following transactions with or by a Third Party: (a) a merger, consolidation or similar transaction involving the Company or the Bank, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Company or the Bank constituting a majority of the consolidated assets of Company or the Bank.

(f)    "Assumed Bank Related Contracts" is defined in Section 5.6.

(g)    "Assumed Contract Liabilities" is defined in Section 7.2(f).

(h)    "Assumed Securities" is defined in Section 2.2.

(i)    "Auction" is defined in Section 5.12(g).

(j)    "Bank" is defined in the recitals.

(k)    "Bank Related Contracts" is defined in Section 2.1.

(l)    "Bank Significant Agreement" is defined in Section 3.12(a).

(m)    "Bank Tax Refund" means that certain refund of Tax in the amount that the Company is currently seeking from the IRS.

(a)    "Bankruptcy Case" is defined in the recitals.

(b)    "Bankruptcy Code" is defined in the recitals.

(c)    "Bankruptcy Court" is defined in the recitals.

(d)    "Bankruptcy Rules" is defined in Section 5.12(f).

(e)    "Benefit Arrangement" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and any other material plan, program, agreement, arrangement, obligation or practice, including, without limitation, any pension, profit sharing, severance, welfare, fringe benefit, employee loan, retirement, medical, welfare, employment or consulting, severance, stay or retention bonuses or compensation, executive or incentive compensation, sick leave, vacation pay, plant closing benefits, disability, workers' compensation, retirement, deferred compensation, bonus, stock option, or purchase or other stock-related, equity incentive or synthetic equity, tuition reimbursement or scholarship, employee discount, meals, travel, or vehicle allowances, plan, program, agreement, arrangement, obligation or practice, any plans subject to Section 125 of the Code, as amended, and any plans or arrangements providing benefits or payments in the event of a change of control, change in ownership or effective control or sale of assets (i) established, sponsored, maintained, or contributed to, or required to be contributed to, by the Bank or any ERISA Affiliate, on behalf of any current or former director, employee, agent, independent contractor, or service provider of

2

the Bank or its Subsidiaries, or their beneficiaries, or (ii) pursuant to which the Bank or any ERISA Affiliate has any Liability or other obligation (whether contingent or otherwise).

(f)  "BHCA" means the Bank Holding Company Act of 1956, as amended.

(g)  "Bid Deadline" is defined in Section 5.12(c).

(h)  "Bidding Procedures" is defined in Section 5.9(b).

(i)  "Bidding Procedures Order" means the bidding procedures order, approving, among other things, the process by which bids may be solicited in connection with the sale of the Shares and the Other Purchased Assets, in the form attached hereto as Exhibit A with such changes as are acceptable to Purchaser and the Company.

(j)  "Books and Records" means all files, ledgers and correspondence, all manuals, reports, texts, notes, memoranda, invoices, receipts, accounts, accounting records and books, financial statements and financial working papers and all other records and documents of any nature or kind whatsoever, including, without limitation, those recorded, stored, maintained, operated, held or otherwise wholly or partly dependent on discs, tapes and other means of storage, including, without limitation, any electronic, magnetic, mechanical, photographic or optical process, whether computerized or not, and all software, passwords and other information and means of or for access thereto, belonging to the Bank or its Subsidiaries or relating to the Business.

(k)  "Broker" means Keefe, Bruyette & Woods, Inc.

(l)  "Broker's Fees" means the actual fees and expenses payable by the Company and/or the Bank to the Broker (including any obligations of the Company or the Bank to indemnify the Broker) in connection with the Closing in an aggregate amount equal to the amount set forth in Section 3.24 of the Disclosure Schedule.

(m)  "Burdensome Condition" means any restraint, limitation, term, requirement, provision or condition that would (i) reasonably be expected to impair in any material respect the benefits to the Purchaser or any of its Affiliates of the Contemplated Transactions; (ii) require any Person other than the Purchaser to become a bank holding company under the BHCA; (iii) require any Person other than the Purchaser to guaranty, support or maintain the capital of the Bank; (iv) require modification of, or impose any limitation or restriction on, the activities, governance, legal structure, compensation, or fee arrangements of the Purchaser or any of its Affiliates (or its partners, members or equity holders); or (v) cause any Person other than the Purchaser to be deemed to control the Bank; provided, however, that the following shall not be deemed to be a "Burdensome Condition": (x) those restraints, limitations, terms, requirements, provisions or conditions specifically applicable to the Bank or its Subsidiaries by reason of their condition as of the date hereof and specifically disclosed to the Purchaser in Section 3.3(b)(ii) of the Disclosure Schedule and (y) any restraint, limitation, term, requirement, provision or condition that applies generally to bank holding companies and banks as provided by statute, regulation, or written and publicly available supervisory guidance of general applicability, in each case, as in effect on the date hereof.

(n)  "Business" means the business currently carried on by the Bank and its Subsidiaries.

(o)  "Business Day" means any day other than a Saturday, Sunday or any federal holiday in the United States.

(p)    "Call Reports" means the Bank's Consolidated Reports of Condition and Income (FFIEC Form 041) or any successor form of the Federal Financial Institutions Examination Council.

(q)    "Cash Purchase Price" is defined in Section 2.2.

(r)    "Charter Documents" means articles or certificate of incorporation, bylaws and any other constituted document of a corporate entity.

(s)    "Closing" means the completion of the sale and purchase of the Shares and the Other Purchased Assets in accordance with Article 7.

(t)    "Closing Date" means five (5) Business Days following the satisfaction or waiver, as applicable, of the conditions set forth in Article 6 and the Sale Order (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions), or such other date as may be agreed upon in writing by the Company and the Purchaser or by their respective counsel.

(u)    "Code" shall mean the Internal Revenue Code of 1986, as amended.

(v)    "Committee" means the official committee of the holders of the Assumed Securities appointed by notice dated November 9, 2012.

(w)    "Common Stock" is defined in Section 3.2(a).

(x)    "Company" is defined in the introductory paragraph.

(y)    "Company's Reports" is defined in Section 3.4(a).

(z)    "Company Tax Returns" is defined in Section 5.18.

(aa)    "Competing Purchase Agreement" is defined in Section 5.12(c)(i).

(bb)    "Conformity Election" is defined in Section 5.17(c).

(cc)    "Consent" means any approval, consent, ratification, waiver or other authorization.

(dd)    "Contemplated Transactions" means all of the transactions between the Company, the Bank and the Purchaser contemplated by this Agreement.

(ee)    "Continuing Board Members" is defined in Section 5.22.

(ff)    "Contracts" means all contracts, agreements, instruments, leases, indentures and commitments, whether written or oral, relating to the Business to which the Company, the Bank or any other Subsidiary is a party, including, without limitation, non-competition, non-solicitation and confidentiality agreements.

(gg)    "Contract Designation Date" is defined in Section 5.6.

(hh)    "CRA" is defined in Section 3.18.

(ii)    "Criticized Assets" is defined in Section 3.21(a).

4

(jj)     "Cure Cost Ceiling" shall mean $500,000.

(kk)     "Deferred Compensation Plan" is defined in <u>Section 5.1(b)(xxi)</u>.

(ll)     "Disclosure Schedule" means the disclosure schedule delivered by the Company to the Purchaser concurrently with execution and delivery of the Original Agreement.

(mm)     "Encumbrance," with respect to any asset, means, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising:

　　　　　i.     a lien, encumbrance, adverse claim, charge, execution, security interest, pledge against such asset, or a subordination to any right or claim of others in respect thereof;

　　　　　ii.     a claim or interest against such asset;

　　　　　iii.     an option or other right to acquire, or to acquire any interest in such asset;

　　　　　iv.     an interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset; and

　　　　　v.     any other encumbrance of whatsoever nature and kind against such asset.

(nn)     "Environmental Claim" means any claim, action, cause of action, suit, proceeding, investigation, order, demand or notice by any Person alleging actual or potential liability (including, without limitation, for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, attorneys' fees or penalties) arising out of, based on, resulting from or relating to (i) the presence, or release into the environment, of, or exposure to, any Materials of Environmental Concern, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

(oo)     "Environmental Laws" means all Legal Requirements relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata, and natural resources), including, without limitation, Legal Requirements relating to (i) emissions, discharges, releases or threatened releases of, or exposure to, Materials of Environmental Concern, (ii) the manufacture, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, (iii) recordkeeping, notification, disclosure and reporting requirements regarding Materials of Environmental Concern, (iv) endangered or threatened species of fish, wildlife and plant and the management or use of natural resources, (v) the preservation of the environment or mitigation of adverse effects on or to human health or the environment, or (vi) emissions or control of greenhouse gases.

(pp)     "Equity Contribution" means the equity contribution, to be made concurrently with the Closing, by the Purchaser to the Bank in an amount necessary to obtain the Purchaser Required Approvals, which equity contribution is not expected to exceed Two Hundred Five Million Dollars ($205,000,000) in cash.  For the avoidance of doubt, the Bank shall not issue any new shares of Common Stock to the Purchaser in connection with the Equity Contribution.

(qq)     "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

(rr)    "ERISA Affiliate" shall mean any entity required to be aggregated in a controlled group or affiliated service group with the Bank for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

(ss)    "FDIC" means the Federal Deposit Insurance Corporation, or any successor thereto.

(tt)    "Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any successor thereto.

(uu)    "GAAP" shall mean generally accepted accounting principles as in effect in the United States.

(vv)    "Governmental Authority" means any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

(ww)    "Governmental Authorization" means any Consent, approval, license, registration, permit or waiver issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

(xx)    "Indemnified Parties" is defined in Section 5.5(a).

(yy)    "Initial Minimum Bid Increment" is defined in Section 5.12(c)(i).

(zz)    "Initial Minimum Overbid" is defined in Section 5.12(c)(i).

(aaa)   "Initial Overbid" is defined in Section 5.12(d)(i).

(bbb)   "June 30 Balance Sheet" is defined in Section 3.6(a).

(ccc)   "Knowledge" of the Company, or words of similar import, including without limitation, the Company being aware of a fact or circumstance, means the actual knowledge as of the Original Agreement Date, after reasonable inquiry, of Albert P. Blank, Craig Carr, Louis J. Dunham, David W. Gifford and Rob Kowalski.

(ddd)   "Leased Properties" is defined in Section 3.10.

(eee)   "Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

(fff)   "Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise.

(ggg)   "Loans" is defined in Section 3.21.

(hhh)   "Material Adverse Effect" means (a) any fact, effect, event, change, occurrence or circumstance, including as a result of a regulatory exam by a Governmental Authority conducted after

the date hereof, that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or would be reasonably expected to have a material and adverse effect on (1) the business, regulatory status, any Regulatory Agreement, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Bank and its Subsidiaries or the Business (as applicable), taken as a whole, or (2) the ability of the Company or the Bank to timely consummate the transactions contemplated by this Agreement; or (b) any other act or omission which would be reasonably expected to materially impair the ability to operate the Business in the Ordinary Course; provided, however, that none of the following shall be taken into account in determining whether there has been a "Material Adverse Effect":  (i) changes in GAAP or regulatory accounting requirements, (ii) changes in laws, rules or regulations of general applicability to companies in the U.S. banking industry, (iii) changes in global, national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity, currency exchange rates, and price levels or trading volumes in the United States or foreign securities markets) affecting other companies or banks in the U.S. banking industry, (iv) any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism, (v) any changes made by the Company or the Bank in the Business or other actions taken, delayed or omitted to be taken by the Company or the Bank at the written request or with the prior written consent of the Purchaser, and (vi) with respect to the Bank, any pre-Closing restrictions or conditions imposed on the Bank as a result of the Regulatory Agreements to which the Bank is a party as of the date of the Original Agreement; except, with respect to clauses (i), (ii),  and (iii), to the extent that the effects of such change are materially disproportionately adverse to the business, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Bank and its Subsidiaries or the Business (as applicable), taken as a whole, as compared to other similarly situated companies in the U.S. banking industry.

(iii)    "Material Governmental Authorization" is defined in Section 3.3(b)(ii).

(jjj)    "Material Permit" is defined in Section 3.3(a).

(kkk)   "Materials of Environmental Concern" means chemicals, pollutants, contaminants, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, greenhouse gases, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins or other substances having an adverse effect on human health or the environment.

(lll)    "Mortgage" means a mortgage, deed of trust, pledge or collateral assignment of property trust beneficiary interest or other instrument creating a lien on or ownership interest in a Mortgaged Property.

(mmm) "Mortgage Finance Agency" means the Federal Housing Administration, the Farmers Home Administration (now known as Rural Housing and Community Development Services), the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture or any other federal or state agency with authority to (i) determine any investment, origination, lending or servicing requirements with regard to mortgage loans originated, purchased or serviced by the Company, the Bank or any of their Subsidiaries (ii) originate, purchase, or service mortgage loans, or otherwise promote mortgage lending, including without limitation state and local housing finance authorities.

(nnn)    "Mortgage Loan" shall mean any loan secured by a Mortgage or a participation interest or certificate or other ownership interest in such a loan that has been sold to a Mortgage Finance Agency.

7

(ooo)   "Mortgaged Property" shall mean the underlying property or properties securing a loan, consisting of a fee simple estate or leasehold estate, or both, in a parcel of land improved by one or more properties, together with any personal property, fixtures, leases and other property or rights pertaining thereto, or property trust beneficiary interest with respect to the foregoing.

(ppp)   "Notice of Sale" means a notice of the sale of the Shares and the Other Purchased Assets and the Sale Hearing.

(qqq)   "OCC" means the Office of the Comptroller of the Currency, which includes the OTS as a predecessor to the OCC.

(rrr)   "Order" means any order, judgment, decree, decision, ruling, writ, assessment, charge, stipulation, injunction or other determination of any Governmental Authority, or any arbitration award entered into by an arbitrator, in each case having competent jurisdiction to render such.

(sss)   "Ordinary Course of Business" or "in the Ordinary Course" means the conduct of the Business in substantially the same manner as the Business was operated on the Original Agreement Date, including operations in conformance with the Bank's practices and procedures as of such date and continued cooperation with Governmental Authorities concerning investigations by or inquiries from Governmental Authorities regarding or relating to the Company, the Bank or their respective directors and employees.

(ttt)   "Original Agreement" is defined in the recitals.

(uuu)   "Original Agreement Date" is defined in the recitals.

(vvv)   "OTS" means the Office of Thrift Supervision.

(www)   "Other Purchased Assets" is defined in Section 2.1.

(xxx)   "Other Real Estate Owned" is defined in Section 3.21(a).

(yyy)   "Outside Date" is defined in Section 6.4(a).

(zzz)   "Owned Mortgage Loan" shall mean a Mortgage Loan owned by the Company, the Bank or their Subsidiaries.

(aaaa)   "Owned Properties" is defined in Section 3.10.

(bbbb)   "Overbidder" is defined in Section 5.12(b).

(cccc)   "Overbidder's Deposit" is defined in Section 5.12(c)(ii).

(dddd)   "Permits" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, orders, certificates, rulings, agreements and other concessions from, of or with Governmental Authorities or other regulatory bodies required to carry on the Business as now being carried on.

(eeee)   "Permitted Liens" means (i) liens for current taxes and assessments not yet delinquent or as to which the Bank is diligently contesting in good faith and by appropriate proceeding either the amount thereof or the liability therefor or both; (ii) liens of landlords, carriers, mechanics, materialmen and repairmen incurred in the Ordinary Course of Business for sums not yet past due, or

8

which are being contested in good faith by appropriate proceedings and for the payment of which adequate reserves in accordance with GAAP and regulatory accounting principles have been established on the books of the Bank, or the defense of which has been accepted by a title insurer, bonding company, other surety or other Person; (iii) any recorded lien (other than for funded indebtedness) relating to any leased premises; (iv) zoning restrictions, easements, licenses and other restrictions on the use of real property or any interest therein, or minor irregularities in title thereto, which do not materially impair the use of such property or the merchantability or the value of such property or interest therein; (v) liens encumbering the interest of the landlord under any real estate lease the existence of which does not result in a default under such real estate leases; (vi) deposits, liens or pledges to secure payments of worker's compensation, unemployment insurance, pensions or other social security obligations, or the performance of bids, tenders, leases, contracts (other than contracts for the payment of money), public or statutory obligations, surety, stay or appeal bonds, or similar obligations arising in the Ordinary Course of Business; (vii) purchase money mortgages or other purchase money or vendor's liens (including, without limitation, finance leases), provided that no such lien shall extend to or cover any other property of the Bank other than that so purchased; (viii) liens on assets given to secure deposits and other liabilities of the Bank arising in the Ordinary Course of Business (including those given to secure borrowings, advances, or discount window availability from any private or governmental banking entity or any clearinghouse); (ix) pledges of securities to secure fed funds borrowings from other banks; and (x) liens arising out of judgments or awards in respect of which the Bank is in good faith prosecuting an appeal or proceeding for review and in respect of which it has secured a subsisting stay of execution pending such appeal or proceeding and which are disclosed or reserved against on the Bank's financial statements.

(ffff)    "Person" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority.

(gggg)    "Petition Date" is defined in the recitals.

(hhhh)    "Post-Close Filings" is defined in Section 5.14.

(iiii)    "Pre-Closing Tax Period" is defined in Section 5.18.

(jjjj)    "Preferred Stock" is defined in Section 3.2(a).

(kkkk)    "Proceedings" means any actions, claims, demands, lawsuits, assessments, arbitrations, judgments, awards, decrees, orders, injunctions, prosecutions and investigations, or other proceedings, of, by, against, or relating to, the Company, the Bank, any other Subsidiary, or the Business.

(llll)    "Properties" is defined in Section 3.10.

(mmmm)    "Proprietary Rights" is defined in Section 3.16.

(nnnn)    "Purchaser" is defined in the introductory paragraph.

(oooo)    "Purchase Plans" is defined in Section 5.29.

(pppp)    "Purchase Price" is defined in Section 2.2.

(qqqq)    "Purchaser Required Approvals" is defined in Section 4.2.

(rrrr)    "Qualified Bid" is defined in Section 5.12(d)(ii).

9

(ssss)    "Qualified Overbidder" is defined in <u>Section 5.12(d)</u>.

(tttt)    "Qualified Plan" is defined in <u>Section 3.9(b)(ii)</u>.

(uuuu)    "Real Estate" is defined in <u>Section 3.10</u>.

(vvvv)    "Regulatory Agreement" is defined in <u>Section 3.3(b)(vii)</u>.

(wwww)    "Sale" is defined in the recitals.

(xxxx)    "Sale Hearing" is defined in <u>Section 5.11(b)</u>.

(yyyy)    "Sale Motion" is defined in <u>Section 5.11</u>.

(zzzz)    "Sale Order" means the order, approving the sale of the Shares and the Other Purchased Assets to the Purchaser, in a form and manner acceptable to Purchaser and the Company.

(aaaaa)    "Serviced Mortgage Loans" is defined in <u>Section 3.23(a)</u>.

(bbbbb)    "Servicing Contracts" is defined in <u>Section 3.23(a)</u>.

(ccccc)    "Shares" is defined in the recitals.

(ddddd)    "Specified Person" means (i) any Person that has indicated an interest in, or could reasonably be expected to have an interest in, participating in any direct or indirect sale of any equity interest in, or any material portion of the assets of, the Company or the Bank or any extraordinary corporate transaction directly or indirectly involving the Company or the Bank, (ii) any Affiliate of any such Person and (iii) any director, officer, employee, agent, representative or advisor of any such Person or any of its Affiliates.

(eeeee)    "Stalking-Horse Bidder Fee" is defined in <u>Section 5.9(a)</u>.

(fffff)    "Subsidiary" includes any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time, directly or indirectly, owned by such party.  The term "Subsidiary" shall include all Subsidiaries of any Subsidiary.

(ggggg)    "Successful Bidder is defined in <u>Section 5.12(b)(i)</u>.

(hhhhh)    "Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other like assessments, including, without limitation, all income, gross receipts, alternative or add-on minimum, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, recapture, real and personal property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest, penalties, additions to tax or additional amounts imposed by any taxing authority, (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period (including any arrangement for group or consortium tax relief or similar arrangement) and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of any express or implied obligation to indemnify any other

Person or as a result of any obligation under any agreement or arrangement to make any payment determined by reference to the Tax liability of a third party.

(iiiii)    "Tax Matter" is defined in Section 5.20.

(jjjjj)    "Tax Refund" means any Tax refunds from any Governmental Authority, including the Bank Tax Refund.

(kkkkk)"Tax Returns" means all returns, statements, reports, documents, declarations, forms, designations, claims for refund, and other information and filings (including elections, disclosures, schedules and estimates), and any attachments, addenda or amendments thereto (whether or not a payment is required to be made with respect to any such return or other document) relating to Taxes.

(lllll)    "Third Party" means any Person or group other than Purchaser and its Affiliates.

(mmmmm)    "Transfer Tax Returns" is defined in Section 5.21.

(nnnnn)"Transfer Taxes" is defined in Section 5.21.

(ooooo)"Trust Preferred Issuers" means the trust preferred securities issued by First Place Capital Trust, First Place Capital Trust II and First Place Capital Trust III.

(ppppp)"Unaudited Financial Statements" means the consolidated unaudited financial statements of the Bank and its Subsidiaries, consisting of consolidated unaudited statements of financial condition as of June 30, 2012, 2011 and 2010, and consolidated unaudited statements of operations, for the years ended June 30, 2012, 2011 and 2010.

(qqqqq)"USA Patriot Act" is defined in Section 3.19.

1.2    Currency.  Except where otherwise expressly provided, all monetary amounts in this Agreement are stated and shall be paid in United States currency.

1.3    Governing Law.  This Agreement and the agreements contemplated hereby shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Delaware, in each case without regard to the conflict of laws principles thereof or of any other jurisdiction.

1.4    Schedules and Exhibits.  The following are the Schedules and Exhibits which are attached to and form part of this Agreement:

| | |
|---|---|
| Schedule I to the Original Agreement | Disclosure Schedule |
| Schedule 2.1 | Acquired Company Assets |
| Schedule 4.2 to the Original Agreement | Purchaser Required Approvals |
| Schedule 5.5(a) to the Original Agreement | Indemnification Agreement |
| Schedule 5.6 | Assumed Bank Related Contracts |
| Schedule 5.8 to the Original Agreement | Broker's Fees |

| | |
|---|---|
| Schedule 5.22 to the Original Agreement | Continuing Board Members |
| Schedule 6.1(h) to the Original Agreement | Consents |
| Exhibit A | Bidding Procedures Order |

## ARTICLE 2

## PURCHASE OF SHARES AND OTHER ASSETS; EQUITY CONTRIBUTION

2.1    Purchase and Sale of the Shares and other Assets.  Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order and for the Purchase Price to be paid as designated in the Sale Order, the Company agrees to (a) sell, assign and transfer to the Purchaser, free and clear of all Encumbrances, and the Purchaser agrees to purchase from the Company, on the Closing Date, effective as of and from the Closing, all of the Shares and (b) sell, assign and transfer to the Bank, free and clear of all Encumbrances, (i) all of the Contracts of the Company that relate to the Business set forth in Section 2.1 of the Disclosure Schedule or that are identified in Section 3.12 of the Disclosure Schedule and that are specifically noted as Contracts of the Company that relate to the Business (collectively, the "**Bank Related Contracts**") that Purchaser has identified on Schedule 5.6 as Assumed Bank Related Contracts; (ii) any right, title and interest of the Company to any proceeds received or to be received after June 30, 2012 related to any Assumed Bank Related Contract, including any such proceeds from any insurance claims to the extent (but, in the case of insurance claims, only to the extent) solely related to the Bank or its Subsidiaries or the Business; (iii) all of the trademarks and service marks registered to the Company set forth in Section 3.16 of the Disclosure Schedule; and (iv) those assets of the Company set forth on Schedule 2.1 attached hereto (the assets identified in clauses (i), (ii), (iii) and (iv) collectively, the "**Other Purchased Assets**").

2.2    Consideration.  The amount payable pursuant to the Sale Order for the Shares and the Other Purchased Assets will be: (i) the assumption of the obligations of the Company pursuant to subordinated notes issued to the Trust Preferred Issuers (the "**Assumed Securities**") with a remaining face amount of Sixty Million Dollars ($60,000,000) followed by a satisfaction and retirement of a portion of the Assumed Securities having a face amount of Forty-Five Million Dollars ($45,000,000) (the "**Cash Purchase Price**"); or, (ii) in the event that Purchaser, after undertaking commercially reasonable efforts to obtain all required regulatory approvals, waivers or non-objections, is not permitted to undertake the indebtedness that would remain outstanding after the payment of the Cash Purchase Price, or such approval, waiver, or non-objection results in a Burdensome Condition being imposed upon Purchaser or its current bank subsidiary, the assumption of obligations of the Company pursuant to Assumed Securities having a face amount of Fifty-Five Million Dollars ($55,000,000) followed by an increase in the Cash Purchase Price to Fifty-Five Million Dollars ($55,000,000) and a satisfaction and retirement of all of such Assumed Securities (the applicable Cash Purchase Price and Assumed Securities that remain outstanding following the consummation of the transaction and the action contemplated in Section 2.3, if applicable, shall be referred to as the "**Purchase Price**"), which shall, subject to the terms and conditions hereof, be payable by the Purchaser pursuant to the Sale Order at Closing (subject to Section 5.8 (Payment of Broker's Fees)).  Concurrently with the Closing, the Purchaser shall make the Equity Contribution.

2.3    Assumption and Satisfaction of Assumed Securities.  At Closing, and in accordance with the requirements of the Sale Order, the Purchaser shall assume the Assumed Securities as follows: (i) in the event the Purchaser pays the Purchase Price as set forth in Section 2.2(i), the Purchaser shall assume Sixty Million Dollars ($60,000,000) of the Assumed Securities, Forty-Five Million Dollars ($45,000,000)

12

of which shall be immediately satisfied and retired with the Cash Purchase Price; or (ii) in the event the Purchaser pays the Purchase Price as set forth in Section 2.2(ii), the Purchaser shall assume Fifty-Five Million Dollars ($55,000,000) of the Assumed Securities, all of which shall be immediately satisfied and retired with the Cash Purchase Price. The Assumed Securities shall be assumed, and retired, pro rata across the various Trust Preferred Issuer issuances. Other than as set forth in this Section 2.3 above, the Purchaser shall have no further obligations to the holders of the preferred securities issued by the Trust Preferred Issuers or any other party for obligations arising out of the preferred securities.

2.4     Payments.  On the Closing Date, the Purchaser shall: (a) pay the Purchase Price for the Shares and the Other Purchased Assets (subject to Section 5.8 (Payment of Broker's Fees)), including the Cash Purchase Price by wire transfer pursuant to the Sale Order and to an account designated by the holders of the Assumed Securities in writing at least two (2) Business Days prior to the Closing Date; (b) pay the amount in excess of the Cure Cost Ceiling to the Company that is necessary in order to cure, assume, and assign all Bank Related Contracts designated by Purchaser; and (c) fund the Equity Contribution to an account of the Bank designated by the Company.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Subject to such exceptions as are disclosed in the Disclosure Schedule dated as of the Original Agreement Date and attached to the Original Agreement, the Company hereby makes the following representations and warranties to the Purchaser as of the Original Agreement Date and as of the Closing Date; provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date.  The inclusion of an item in the Disclosure Schedule shall not be deemed an admission by the Company or the Bank that such item represents a material fact, event, or circumstance or has had or would be reasonably expected to have a Material Adverse Effect.  Disclosure in any section of the Disclosure Schedule shall apply only to such section of such Disclosure Schedule, except to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is relevant to another section of such Disclosure Schedule.

3.1     Corporate Status and Authority; Non-Contravention.

(a)     Status of the Company.  The Company is duly organized, validly existing and in good standing under the laws of the State of Delaware and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted.  The Company is duly registered as a savings and loan holding company.  The Company is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Status of Bank.  The Bank is a federal savings association and direct, wholly-owned Subsidiary of the Company, is duly organized, validly existing and in good standing under the laws of the United States of America, is authorized under the laws of the United States of America to engage in the Business and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the Business in the manner in which the Business is now being conducted.  The Bank is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect. The Bank is duly authorized by the OCC to conduct business as a federal savings association. The deposit accounts of the Bank are insured to the fullest extent permitted by law by the Deposit Insurance Fund

(including through the Transaction Deposit Insurance Guaranty Program), which is administered by the FDIC. The FDIC has not been appointed receiver of the Bank. Complete and correct copies of the Charter Documents of the Bank, as currently in effect, have prior to the date hereof been delivered to the Purchaser.

(c)     Due Authorization.  (i) The Company has full legal right, corporate power and authority to enter into this Agreement and, subject to the Sale Order, to carry out its obligations hereunder and thereunder; and (ii) the execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement and, subject to the Sale Order, the completion and performance of the Contemplated Transactions have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement have been duly executed and delivered by the Company and, subject to the Sale Order, constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms.  No other corporate proceedings, including any stockholder or debt holder approvals, are necessary for the execution and delivery by the Company of this Agreement, the performance by it or of its obligation hereunder or thereunder or the consummation by it of the Contemplated Transactions.

(d)     Non-contravention.  Except as disclosed on Section 3.1(d) of the Disclosure Schedule, neither the execution and delivery of this Agreement, nor, subject to the Sale Order, the completion and performance of the Contemplated Transactions, or compliance by the Company with any of the provisions hereof or thereof, will (i) materially violate, materially conflict with, or result in a material breach of any provision of, or constitute a material default (or an event which, with notice or lapse of time or both, would constitute a material default) under, or result in the termination of, or result in the loss of any benefit or creation of any material right on the part of any third party under, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of any material Encumbrance upon any of the material properties or assets of the Company or any Subsidiary under any of the terms, conditions or provisions of (A) the Charter Documents of the Company, the Bank or any other Subsidiary, or (B) any material note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company, the Bank or any other Subsidiary is a party or by which it may be bound, or to which the Company, the Bank or any other Subsidiary or any of the properties or assets of the Company, the Bank or any other Subsidiary may be subject, or (ii) assuming the Purchaser Required Approvals are duly obtained, violate in any material respect any Legal Requirement or any judgment, ruling, order, writ, injunction or decree applicable to the Company, the Bank or any other Subsidiary or any of their respective properties or assets.

3.2     Capitalization of the Bank.

(a)     Ownership.  The authorized capital stock of the Bank consists of 33,000,000 shares of common stock, $1.00 par value (the "**Common Stock**"), of which 560,198 shares of Common Stock are outstanding and 3,000,000 shares of preferred stock, $1.00 par value (the "**Preferred Stock**"), of which no shares of Preferred Stock are outstanding. No other shares of capital stock of the Bank are issued or outstanding. All of the outstanding shares of Common Stock and Preferred Stock are directly and beneficially owned and held by the Company and have been duly authorized and validly issued, are fully paid and nonassessable with no personal liability attaching to the ownership thereof, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances.

14

(b)  <u>Outstanding Stock Rights</u>.  There are no (i) outstanding preemptive rights, subscriptions, options, calls, warrants or other rights of any kind or nature to acquire any securities of the Bank or its Subsidiaries; (ii) outstanding securities, instruments or obligations that are or may become convertible into or exchangeable for any securities of the Bank or its Subsidiaries; (iii) Contracts under which the Company or any of its Subsidiaries or the Bank and its Subsidiaries are or may become obligated to sell, issue or otherwise dispose of or redeem, purchase or otherwise acquire any securities of the Bank or its Subsidiaries; (iv) shareholder agreements, voting trusts or other agreements, arrangements or understandings to which the Company or any of its Subsidiaries or the Bank and its Subsidiaries is a party or of which the Company is aware, that may reasonably be expected to affect the exercise of voting or any other rights with respect to the capital stock of the Bank or its Subsidiaries, or (v) outstanding bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the shareholder of the Bank or its Subsidiaries may vote.

(c)  <u>Bank Subsidiaries</u>.  Other than the Subsidiaries set forth on <u>Section 3.2(c)</u> of the Disclosure Schedule, the Bank does not have any Subsidiaries nor own any equity interests in any other Person.  Each Subsidiary is a direct, wholly owned Subsidiary of the Bank, is duly organized, validly existing and in good standing under the laws of the state set forth on <u>Section 3.2(c)</u> of the Disclosure Schedule, is authorized under the laws of such state to engage in the Business that the Subsidiary, conducts and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the Business that the Subsidiary conducts in the manner in which the Business that the Subsidiary conducts is now being conducted.  Each Bank Subsidiary is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect.  All of the outstanding shares of each Bank Subsidiary are directly and beneficially owned and held by the Bank and have been duly authorized and validly issued, are fully paid and nonassessable with no personal liability attaching to the ownership thereof, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances.  The operations of each Bank Subsidiary are as described in <u>Section 3.2(c)</u> of the Disclosure Schedule.

(d)  <u>Ownership of Assets Covenant</u>.  Neither the Company nor any of its Subsidiaries (other than the Bank and its Subsidiaries) (i) owns or has any right to use any asset or property (whether real, personal, tangible, intangible or otherwise) used in or held for use in, or related to, the Business or (ii) other than the Bank Related Contracts, is a party to any Contract relating to the Business.  Except as disclosed on <u>Section 3.2(d)</u> of the Disclosure Schedule, no Subsidiary of the Company (other than the Bank or its Subsidiaries) has or owns any interest in any Tax Refund (or any proceeds of any Tax Refund received or to be received after June 30, 2012) or any proceeds received or to be received after June 30, 2012 related to any Assumed Bank Related Contract (including any proceeds from any insurance claim to the extent related to the Bank or its Subsidiaries or the Business).  Notwithstanding the above, the Company shall assign to the Purchaser those tax assets identified in <u>Schedule 2.1</u>.

3.3  <u>Business Operations</u>.

(a)  <u>Permits</u>.  The Bank and its Subsidiaries hold all Permits material to the Business, including without limitation all Permits required from the FDIC and the OCC, to conduct a commercial banking business (each, a "**Material Permit**").  All of the Material Permits are validly issued, are in full force and effect and are being complied with by the Bank and its Subsidiaries in all material respects.  Except as set forth on <u>Section 3.3(a)</u> of the Disclosure Schedule, no notice of breach or default in respect of any Material Permit has been received by the Bank or its Subsidiaries and there are no Proceedings in progress, pending or, to the Company's Knowledge, threatened which would reasonably be expected to

15

result in the cancellation, revocation, suspension or adverse alteration of any of them, and the Company is not aware of any existing matters or state of facts which is reasonably likely to give rise to any such notice or Proceeding.

(b)    Governmental Authorizations.   Except as set forth on Section 3.3(b) of the Disclosure Schedule:

(i)    Each Governmental Authorization that is held by the Bank or its Subsidiaries or that otherwise relates to the Business is valid and in full force and effect.

(ii)    The Bank and its Subsidiaries are in compliance in all material respects with all of the terms and requirements of each Governmental Authorization applicable to it that is material to the Business (a "**Material Governmental Authorization**").

(iii)    No event has occurred or circumstance exists that would or would reasonably be expected to (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a material violation of or a failure to comply with any material term or requirement of any Material Governmental Authorization, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, or would otherwise impair in any way, any Material Governmental Authorization.

(iv)    Neither the Company nor the Bank (nor its Subsidiaries) has received any notice or other communication from any Governmental Authority regarding (A) any actual, alleged, possible or potential violation of or failure to comply with any material term or requirement of any Material Governmental Authorization or (B) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Material Governmental Authorization.

(v)    All applications required to have been filed for the renewal of the Material Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authority, except as have not had, and would not reasonably be expected to be, material.

(vi)    There is no authorization, license, approval, Consent, order or any other action of, or any registration, declaration, filing or notice with or to any Governmental Authority or court that is required for the execution or delivery by the Company of this Agreement or the validity or enforceability of this Agreement against the Company, and, subject to the Sale Order and the receipt of the Purchaser Required Approvals, the completion or performance by the Company of any of the Contemplated Transactions.

(vii)    The Bank and its Subsidiaries are not subject to any cease-and-desist or other similar order or enforcement action issued by, nor is any of them a party to any written agreement, consent agreement or memorandum of understanding with, or a party to any commitment letter or similar undertaking to, or subject to any capital directive by, or adopted any board resolutions at the request of, any Governmental Authority (each item in this sentence, a "**Regulatory Agreement**"), nor has the Bank or its Subsidiaries been notified since January 1, 2009 by any Governmental Authority that it is considering issuing, initiating, ordering, or requesting any such Regulatory Agreement. The Bank and its Subsidiaries are in compliance in all material respects with each Regulatory Agreement to which either of them is a party or subject, and neither the Bank nor its Subsidiaries has received any notice from any

16

Governmental Authority indicating that the Bank or its Subsidiaries is not in compliance in all material respects with any such Regulatory Agreement.

(viii)    Except for normal examinations conducted by a Governmental Authority in the regular course of the Business and except as disclosed in Section 3.8 of the Disclosure Schedule, no Governmental Authority has initiated any Proceeding into the Business or operations of the Bank or its Subsidiaries since January 1, 2009.  There is no unresolved violation, criticism or exception by any Governmental Authority with respect to any report or statement relating to any examinations or inspections of the Bank or its Subsidiaries.  Other than the current OCC safety and soundness examination, as of the Original Agreement Date, no regulatory examination of the Bank or its Subsidiaries is under way, and no other report of examination is pending.

(c)    Compliance with Law.  Except as set forth on Section 3.3(c) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is in material violation of, or has materially violated, and to the Knowledge of the Company neither the Company nor any of its Subsidiaries is under investigation with respect to or has been threatened to be charged with or given notice of any material violation of, any Legal Requirement.

3.4    Regulatory Reports.

(a)    Company's Reports.  Except as set forth on Section 3.4(a) of the Disclosure Schedule, the Company has filed or furnished, as applicable, on a timely basis, all forms, filings, registrations, submissions, statements, certifications, reports and documents required to be filed or furnished by it with any Governmental Authority, including any and all federal and state banking authorities, since January 1, 2009 (including any amendments thereto, the "**Company's Reports**"). Except as set forth on Section 3.4(a) of the Disclosure Schedule, each of the Company's Reports, at the time of its filing or being furnished, complied as to form in all material respects with all Legal Requirements applicable to the Company's Reports.  Except as set forth in Section 3.4(a) of the Disclosure Schedule, as of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment), the Company's Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

(b)    Bank's Reports.  Except as set forth on Section 3.4(b) of the Disclosure Schedule, the Bank and its Subsidiaries have duly filed with the OCC, the OTS, the FDIC and any other applicable Governmental Authorities, as the case may be, in correct form in all material respects, the reports, returns and filing information data required to be filed under any applicable Legal Requirement, including any and all federal and state banking authorities, and such reports were complete and accurate in all material respects and in compliance in all material respects with the requirements of any applicable Legal Requirement.  Except as set forth on Section 3.4(b) of the Disclosure Schedule, as of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment), such reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

3.5    Deposits.  All of the deposits held by the Bank (including the records and documentation pertaining to such deposits) have been established and are held in compliance in all material respects with (i) all applicable policies, practices and procedures of the Bank, and (ii) all applicable Legal Requirements, including anti-money laundering, anti-terrorism, or embargoed persons requirements.  All of the deposit accounts of the Bank are insured to the maximum limit set by the FDIC and any premiums and assessments required to be paid in connection therewith have been fully paid, and no proceedings for

the termination or revocation of such insurance are pending, or, to the Knowledge of the Company, threatened.

3.6    Financial Matters.

(a)    Bank Financial Statements.  The Company has, prior to the date hereof, provided to the Purchaser the Unaudited Financial Statements, which are attached as Section 3.6(a) of the Disclosure Schedule.  Except as set forth on Section 3.6(a) of the Disclosure Schedule, the Unaudited Financial Statements (i) are true, accurate and complete in all material respects, (ii) have been prepared in accordance with GAAP (except for the omission of footnotes) and regulatory accounting principles consistently applied and (iii) fairly present in all material respects the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations, for the respective periods set forth therein.  The consolidated financial statements of the Bank and its Subsidiaries to be prepared after the Original Agreement Date and prior to the Closing (A) will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP (except for the omission of footnotes) and regulatory accounting principles consistently applied and (C) will fairly present in all material respects the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations for the respective periods set forth therein.  The balance sheet dated June 30, 2012, included in the Unaudited Financial Statements is referred to as the "**June 30 Balance Sheet.**"

(b)    Call Reports.  The financial statements contained in the Call Reports of the Bank to be prepared after the Original Agreement Date and prior to the Closing (A) will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (C) will fairly present in all material respects the consolidated financial condition of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations and stockholders' equity for the respective periods set forth therein, subject, in the case of interim period financial statements, to year-end adjustments (none of which will be material).

(c)    Systems and Processes.  Except as set forth on Section 3.6(c) of the Disclosure Schedule, the Bank and its Subsidiaries have in place sufficient systems and processes that are customary for a community bank of the size of the Bank and that are designed to (x) provide reasonable assurances regarding the reliability of the Bank's and its Subsidiaries' financial statements and (y) in a timely manner accumulate and communicate to the Bank's and its Subsidiaries' principal executive officer and principal financial officer the type of information that would be required to be disclosed in the Bank's and its Subsidiaries' financial statements.  Except as set forth on Section 3.6(c) of the Disclosure Schedule, neither the Bank or its Subsidiaries nor, to the Company's Knowledge, any employee, auditor, accountant or representative of the Bank or its Subsidiaries has received or otherwise had or obtained Knowledge of any complaint, allegation, assertion or claim, whether written or oral, regarding the adequacy of such systems and processes or the accuracy or integrity of the Bank's or its Subsidiaries' financial statements.  Except as set forth on Section 3.6(c) of the Disclosure Schedule, to the Company's Knowledge, there has been no instance of fraud by the Bank or its Subsidiaries, whether or not material, that occurred during any period since January 1, 2009.

(d)    Auditor Independence.  Except as set forth on Section 3.6(d) of the Disclosure Schedule, since January 1, 2009, the Company's and the Bank's external auditor was independent of the Company and the Bank and their management.  As of the date hereof, except as set forth on Section 3.6(d) of the Disclosure Schedule, the Company's and the Bank's external auditor has not resigned or

been dismissed as a result of or in connection with any disagreements with the Company on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

        (e)      Books and Records.

                (i)     Except as set forth on Section 3.6(e)(i) of the Disclosure Schedule, the Books and Records have been and are being maintained in the Ordinary Course of Business in accordance and compliance with all applicable accounting requirements and Legal Requirements and are complete in all material respects to reflect corporate action by the Bank and its Subsidiaries. Neither the Company nor the Bank nor any of their Subsidiaries have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K of the Securities Act of 1933, as amended.

                (ii)    The records, systems, controls, data and information of the Bank and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and control of the Bank and its Subsidiaries or any of their accountants (including all means of access thereto and therefrom) in all material respects. Except as set forth on Section 3.6(e)(ii) of the Disclosure Schedule, the Bank and its Subsidiaries have established and maintain a system of internal accounting controls sufficient to provide reasonable assurances that (A) transactions are executed in accordance with its management's general or specific authorizations and (B) transactions are recorded in conformity with GAAP consistently applied and all Legal Requirements. Since January 1, 2009, except as set forth on Section 3.6(e) of the Disclosure Schedule, the Bank and its Subsidiaries or, to the Company's Knowledge, any director, senior executive officer, auditor or independent accountant, has not received written notice or otherwise obtained knowledge of any material weakness regarding the accounting or auditing practices, procedures or methods of the Bank and its Subsidiaries or their respective internal accounting controls, other than material weaknesses that have been remedied prior to the Original Agreement Date.

        (f)      Liabilities. Neither the Bank nor any of its Subsidiaries has any Liability, and there is no existing condition, situation or set of circumstances that could reasonably be expected to result in such a Liability, except:

                (i)     Liabilities to the extent disclosed on, reflected in or provided for in the June 30 Balance Sheet;

                (ii)    Liabilities incurred in the Ordinary Course of Business since June 30, 2012, except those, that individually or in the aggregate, are not material;

                (iii)   Liabilities disclosed in the Disclosure Schedule;

                (iv)   Liabilities arising from this Agreement; and

                (v)    Other Liabilities that, individually or in the aggregate, are not material.

    3.7    Tax Matters. Except as set forth on Section 3.7 of the Disclosure Schedule:

        (a)      Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has filed all federal income Tax Returns and all other material Tax Returns required to be filed by it. All such Tax Returns were true, correct and complete in all material respects and accurately reflected in all material respects the taxable income (or other measure of Tax) of the Bank and its Subsidiaries.

(b)     Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has paid all Taxes with respect to which there is any direct or indirect Liability on the part of one or more of the Bank, its Subsidiaries or the consolidated, combined, affiliated, unitary or other tax group including the Company, the Bank and its Subsidiaries whether or not shown on any Tax Return. The Bank and its Subsidiaries have established reserves in accordance with GAAP that are adequate for the payment of all Taxes not yet due and payable with respect to the assets and operations of the Bank and its Subsidiaries..

(c)     Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has withheld and paid to the appropriate taxing authority all material Taxes required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party and all Forms W-2 and 1099 and any other forms required with respect thereto have been properly completed and timely filed.

(d)     None of the Company, the Bank or its Subsidiaries has received from any taxing authority written notice of, and, to the Knowledge of the Company, there is not threatened, any audit, claim, action, suit, request for information, ruling, determination, investigation or administrative or judicial proceeding that is pending or being conducted with respect to Taxes of the Bank or its Subsidiaries.  None of the Company, the Bank or its Subsidiaries has received from any taxing authority (including in jurisdictions in which the Bank or its Subsidiaries has not filed Tax Returns) written notice of, and, to the Knowledge of the Company, there is not threatened, any proposed assessment, adjustment or deficiency for any amount of Taxes proposed, asserted, or assessed against the Bank or its Subsidiaries.

(e)     Neither the Bank nor its Subsidiaries is a party to or bound by any Tax sharing, allocation or indemnification agreement or similar agreement or arrangement.

(f)     Neither the Bank nor its Subsidiaries has, in the longer of the past two years or in all tax years for which the statute of limitations has not expired, or to the Knowledge of the Company, prior years, constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code.

(g)     Neither the Bank nor its Subsidiaries will be required, for income Tax purposes for any taxable period ending after the Closing Date, to include in its taxable income any item of income or gain or to exclude from its taxable income any item of deduction or loss as a result of any (i) change in method of accounting under Section 481(c) of the Code (or any corresponding or similar provision of state, local or foreign law) for a taxable period ending on or prior to the Closing Date, (ii) closing agreement under Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition occurring on or prior to the Closing Date, or (iv) prepaid amount received on or prior to the Closing Date.

(h)     There are no liens or encumbrances for Taxes on any of the assets of the Bank or its Subsidiaries other than liens or encumbrances for Taxes not yet due and payable.

(i)     No written claim has been received in the last six years by the Company, the Bank or its Subsidiaries from a taxing authority in a jurisdiction where the Bank or its Subsidiaries does not file Tax Returns that the Bank or its Subsidiaries is or may be subject to taxation by that jurisdiction or should have been included in a combined, consolidated, affiliated, unitary or other group Tax Return of that jurisdiction.

(j)     Neither the Bank nor its Subsidiaries has engaged in any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4(b).

3.8    <u>Litigation and Claims</u>.  Except as set forth on <u>Section 3.8</u> of the Disclosure Schedule, there are no pending or, to the Knowledge of the Company, threatened Proceedings against or relating specifically to the Bank or its Subsidiaries or the Business that would reasonably be expected to materially interfere with or delay any of the Contemplated Transactions.  Except as set forth on <u>Section 3.8</u> of the Disclosure Schedule, there is no material Order or regulatory restriction imposed upon or relating specifically to the Bank or its Subsidiaries or the Business that would reasonably be expected to materially interfere with or delay any of the Contemplated Transactions.

3.9    <u>Employee Matters.</u>

(a)    <u>Employees</u>. Section 3.9(a) of the Disclosure Schedule sets forth, for each officer and other key employee whose annual compensation equals or exceeds $100,000 of the Bank or its Subsidiaries, such employee's name, title, hire date, location, whether full- or part-time, and whether active or on leave (and, if on leave, the nature of the leave and the expected return date).  Five (5) days prior to the Closing Date, the Company will provide the Purchaser with a revised version of <u>Section 3.9(a)</u> of the Disclosure Schedule, updated as of such date.  No officer or other key employee whose compensation equals or exceeds $100,000 of the Bank or its Subsidiaries has indicated to the Company, the Bank or any of their Subsidiaries that he or she intends to resign or retire as a result of the Contemplated Transactions contemplated by this Agreement or otherwise within one year after the Closing Date.

(b)    <u>Employee Benefit Plans; Labor</u>.

(i)    <u>Section 3.9(b)(i)</u> of the Disclosure Schedule sets forth a complete and correct list of each Benefit Arrangement.  The Company has prior to the date hereof provided to the Purchaser correct and complete copies of (i) each Benefit Arrangement, including all amendments thereto (or, in the case of any such Benefit Arrangement that is unwritten, descriptions thereof), (ii) the most recent annual reports on Form 5500 filed with the Internal Revenue Service with respect to each Benefit Arrangement (if any such report was required), (iii) the most recent summary plan description for each Benefit Arrangement for which such summary plan description is required and (iv) each trust agreement and insurance or group annuity contract relating to any Benefit Arrangement.

(ii)    Each Benefit Arrangement that is intended to be tax qualified under Section 401(a) of the Code (each, a "**Qualified Plan**") and each trust established in connection with any Qualified Plan which is intended to be tax exempt under Section 501(a) of the Code is tax qualified or tax exempt, as applicable, and the Bank has received a determination letter or an opinion letter from the Internal Revenue Service upon which it may rely regarding each such Qualified Plan's qualified status under the Code, and to the Company's Knowledge, no event has occurred since the date of the most recent determination letter or application relating to any such Qualified Plan that would adversely affect the qualification of such Qualified Plan.  The Company has prior to the date hereof provided to the Purchaser a correct and complete copy of the most recent determination letter or opinion letter received with respect to each Qualified Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(iii)    Except as set forth on <u>Section 3.9(b)(iii)</u> of the Disclosure Schedule, each Benefit Arrangement has been administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code, all other Legal Requirements and the terms of all applicable collective bargaining agreements (if any).  No events have occurred with respect to any Benefit Arrangement that could result in payment or assessment by or against the Bank or its Subsidiaries of any excise taxes under Section 4972, 4975, 4976, 4977, 4979, 4980B, 4980D, 4980E or 5000 of the Code.  There are no investigations by any Governmental Authority, termination proceedings

or other claims (except routine claims for benefits payable under the Benefit Arrangements) or Proceedings against or involving any Benefit Arrangement.

(iv)    Neither the Company nor the Bank (or its Subsidiaries) has any obligation to gross up, indemnify or otherwise reimburse any current or former employee of the Bank or its Subsidiaries for any tax incurred by any such employee, including, without limitation, under Section 409A or 4999 of the Code. No Benefit Arrangement, individually or collectively, would reasonably be expected to result in the payment of any amount that would not be deductible under Section 280G of the Code.

(v)    No Qualified Plan is, or ever has been, subject to Title IV of ERISA or Section 412 of the Code. No direct, contingent or secondary liability to any Person has been incurred or could reasonably be expected to be incurred by the Bank or its ERISA Affiliates under Title IV of ERISA.

(vi)    Neither the Bank nor any of its ERISA Affiliates contributes to, or has within the preceding six years, contributed to or incurred any contingent or actual liability or other obligation in connection with, any Multiemployer Plan. Neither the Bank nor any of its ERISA Affiliates has, within the preceding six years, withdrawn in a complete or partial withdrawal from any Multiemployer Plan or incurred any liability under Section 4204 of ERISA that has not been satisfied in full.

(vii)    Except as set forth on Section 3.9(b)(vii) of the Disclosure Schedule, the Bank and its Subsidiaries have no obligation to provide medical, dental or life insurance benefits (whether or not insured) to any employees or former employees of the Bank or its Subsidiaries (or beneficiary thereof) after retirement or other termination of service (other than coverage mandated by Legal Requirements).

(viii)    There are no collective bargaining agreements binding on the Bank or its Subsidiaries; none of the employees of the Bank or its Subsidiaries is represented by a labor union, and, to the Knowledge of the Company, there is no, and since January 1, 2009, has been no, (i) organizational effort made or threatened by or on behalf of any labor organization or trade union to organize any employees of the Bank or its Subsidiaries, and (ii) no demand for recognition of any employees of the Bank or its Subsidiaries has been made by or on behalf of any labor organization or trade unions.

(ix)    There are no, and since January 1, 2009, there have not been any, strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Company, contemplated or threatened against or involving the Bank or its Subsidiaries.

(x)    The Company is in compliance, in all material respects, with all applicable Legal Requirements respecting employment and employment practices, including those relating to labor management relations, wages, hours, overtime, employee classification, discrimination, sexual harassment, civil rights, affirmative action, work authorization, immigration, safety and health, information privacy and security, workers compensation, continuation coverage under group health plans, wage payment and the payment and withholding of Taxes.

(xi)    Except as set forth on Section 3.9(b)(xi) of the Disclosure Schedule, there are no Proceedings pending or, to the Knowledge of the Company, threatened against or affecting the Bank or its Subsidiaries, relating to the alleged material violation of any applicable Legal Requirement pertaining to labor relations or employment related matters.

22

(xii)    Except as set forth on <u>Section 3.9(b)(xii)</u> of the Disclosure Schedule, the consummation of the transactions contemplated by this Agreement will not (either alone or together with any other event) entitle any current or former employee, consultant or independent contractor of the Bank or its Subsidiaries to severance pay or accelerate the time of payment or vesting or trigger any material payment or funding (through a grantor trust or otherwise) of compensation or benefits under, materially increase the amount payable or trigger any other material obligation pursuant to, any Benefit Arrangement or otherwise.

(xiii)    There has been no amendment to, written interpretation of or announcement (whether or not written) by the Company, the Bank or the Bank's Subsidiaries relating to, or change in employee participation or coverage under, any Benefit Arrangement that would increase materially the expense of maintaining such plan above the level of expense incurred in respect thereof for the most recent fiscal year ended prior to the date hereof.

(xiv)    Except as set forth on Section <u>3.9(b)(xiv)</u> of the Disclosure Schedule, any and all benefits and coverage under each health, accident, life, disability and similar plan or arrangement sponsored by the Company, the Bank or any Subsidiary is not other than fully insured.

(xv)    Except as set forth on Section <u>3.9(b)(xv)</u> of the Disclosure Schedule, no Benefit Arrangement, or similar plan or arrangement sponsored by the Company, the Bank or any Subsidiary, is subject to any requirement of Section 409A of the Code.

3.10    <u>Properties and Leases</u>.  The Bank or its Subsidiaries (a) has good, valid and marketable title to all the properties and assets reflected in the June 30 Balance Sheet or acquired after the date thereof (except properties sold or otherwise disposed of since the date thereof in the Ordinary Course) (the "**Owned Properties**"), free and clear from any Encumbrances other than Encumbrances that, (A) individually or in the aggregate, (i) do not, and would not reasonably be expected to, affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiaries in any material respect or otherwise be material, (ii) do not secure indebtedness for borrowed money and (iii) arose only in the Ordinary Course and (B) in the case of Owned Properties consisting of Real Estate, Permitted Liens, (b) is the lessee of all leasehold estates reflected in the June 30 Balance Sheet or acquired after the date thereof (except for leases that have expired by their terms since the date thereof) (the "**Leased Properties**" and, collectively with the Owned Properties, the "**Properties**"; and any Property consisting of real estate or buildings or improvements thereon ("**Real Estate**")), free and clear from Encumbrances other than Encumbrances that, (A) individually or in the aggregate, (i) would not, and would not reasonably be expected to, affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiaries in any material respect or otherwise be material, (ii) do not secure indebtedness for borrowed money and (iii) arose only in the Ordinary Course and (B) in the case of Leased Properties consisting of Real Estate, Permitted Liens and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to the Knowledge of the Company, the lessor, and (c) owns or leases all properties and assets as are used by the Bank or its Subsidiaries in the Business or otherwise necessary to their respective operations as now conducted. <u>Section 3.10</u> of the Disclosure Schedule contains a true and complete list of all Real Estate as of the Original Agreement Date and identifies which Real Estate is owned and which is leased. The Real Estate is in material compliance with all applicable zoning laws and building codes, and the buildings and improvements located on the Real Estate are in good operating condition and in a state of good working order, ordinary wear and tear excepted. There are no pending or, to the Knowledge of the Company, threatened material condemnation proceedings against any of the Real Estate. The Bank and its Subsidiaries are in compliance with all applicable health and safety related requirements for the Real Estate, including those under the Americans with Disabilities Act of 1990 and the Occupational Safety and Health Act of 1970.

23